JOHN T. JASNOCH (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619/233-4565
619/233-0508 (fax)
jjasnoch@scott-scott.com

*Counsel for Plaintiffs and the Class*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DAVID MESSINGER, GERALD ASHFORD, IRVING S. AND JUDITH BRAUN, ELLIE MARIE TORONTO ESA, VARGHESE PALLATHU, JOSEPH CIANCI, and JOHNNY RAMEY, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

UBER TECHNOLOGIES, INC., DARA KHOSROWSHAHI, NELSON CHAI, GLEN CEREMONY, RONALD SUGAR, URSULA BURNS, GARRETT CAMP, MATT COHLER, RYAN GRAVES, ARIANNA HUFFINGTON, TRAVIS KALANICK, WAN LING MARTELLO, H.E. YASIR AL-RUMAYYAN, JOHN THAIN, DAVID TRUJILLO, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS CAPITAL INC., CITIGROUP GLOBAL MARKETS INC., ALLEN & COMPANY LLC, RBC CAPITAL MARKETS, LLC, SUNTRUST ROBINSON HUMPHREY, INC., DEUTSCHE BANK SECURITIES INC., HSBC SECURITIES (USA) INC., SMBC NIKKO SECURITIES AMERICA, INC., MIZUHO SECURITIES USA LLC, NEEDHAM & COMPANY, LLC, LOOP CAPITAL MARKETS LLC, SIEBERT CISNEROS SHANK & CO., L.L.C., ACADEMY SECURITIES, INC., BTIG, LLC, CANACCORD GENUITY LLC, CASTLEOAK SECURITIES, L.P., COWEN AND COMPANY, LLC, EVERCORE GROUP L.L.C., JMP SECURITIES LLC, MACQUARIE CAPITAL (USA) INC., MISCHLER FINANCIAL GROUP,

Case No.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**

1 | INC., OPPENHEIMER & CO. INC., RAYMOND
2 | JAMES & ASSOCIATES, INC., WILLIAM BLAIR
& COMPANY, L.L.C., THE WILLIAMS CAPITAL
3 | GROUP, L.P., and TPG CAPITAL BD, LLC,

4 |             Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs David Messinger, Gerald Ashford, Irving S. and Judith Braun, Ellie Marie Toronto ESA, Varghese Pallathu, Joseph Cianci, and Johnny Ramey (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge, as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through their attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, analyst and media reports, and consultations and interviews with persons familiar with the business of Defendant Uber Technologies, Inc. ("Uber" or the "Company") and the industry in which it operates.  Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below).  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      On May 13, 2019, Uber conducted one of the most anticipated U.S. initial public offerings (the "IPO") in recent years, raising over **_$8 billion_** (after deducting underwriting discounts and commissions and estimated offering expenses) by selling over 180 million shares of the Company's Class A common stock to the public at the IPO offering price of $45.00 per share (the "IPO Price").  In addition to generating a staggering amount of capital for the Company, the IPO also represented an extraordinary financial windfall for the 29 Underwriter Defendants (defined below), who collected over $106.2 million in fees in connection with the IPO (of which roughly $40 million went to Defendant Morgan Stanley & Co. LLC ("Morgan Stanley"), roughly $20 million went to Defendant Goldman Sachs & Co. LLC ("Goldman Sachs"), and roughly $10 million went to Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")).

2.      Unfortunately for investors, however, the IPO Registration Statement and Prospectus (collectively, the "Offering Documents") that Uber and the other Defendants used to conduct the IPO were materially false, misleading, and incomplete and omitted to disclose material adverse facts about the Company and its business, including that:

(a)      The Company was plagued by serious safety problems, which were compounded by patently defective investigative and safety enforcement policies and practices that were shamefully insufficient to adequately prevent, punish, and deter acts of sexual assault and other tortious conduct against Uber customers.  For example, at the time of the IPO, the Company was aware of **thousands** of reports of sexual assaults committed **in just the United States** by Uber drivers against Uber customers.  Accordingly, and contrary to the Offering Documents' statements concerning the Company's purported commitment to user safety, Uber drivers had engaged in widespread criminal and other misconduct against Uber passengers that ranged from non-consensual touching to violent assaults and rapes.   Moreover, Uber's process for handling complaints and reports of wrongful conduct was patently defective, as it effectively prioritized efforts to limit the Company's liability (and its exposure to negative publicity) over customer safety.  For example, Uber's "Special Investigation Unit" (or "SIU") actively sought to shield Uber from legal liability and adverse publicity by (among other things) forbidding Uber investigators from forwarding to the police allegations of criminal misconduct by Uber drivers, and by similarly forbidding its investigators from advising victims of such criminal conduct to seek legal counsel or to report the misconduct to law enforcement authorities.  At the same time, Uber routinely allowed miscreant Uber drivers to stay on the road (and to keep generating revenue for the Company).  Such policies and practices helped to mask the true nature and widespread extent of Uber's serious safety problems as of the IPO, but exposed the Company to brutal adverse publicity and increased legal liability as investors learned the extent to which Uber's policies – instead of effectively deterring and preventing sexual assaults and other misconduct against its own customers – had actually allowed large numbers of dangerous Uber drivers to remain on the road and to threaten, harass, and sexually assault even more customers.

(b)      The Company was experiencing accelerating losses.  Indeed, as of the May 2019 IPO, Uber was on track to record for the second quarter of 2019 (which closed on June 30, 2019) ("2Q2019") a shocking loss of **$5.2 billion**, its largest quarterly loss ever.  Relatedly, and also unbeknownst to investors, the Offering Documents failed to disclose that, as of the IPO, Uber's revenue growth was stagnating or declining, as was Uber's "Take Rate" (*i.e.*, money retainer per

trip) due in substantial part to the Company's pre-IPO decision to significantly increase the amount of subsidies given to Uber drivers and customers for using and providing Uber's ride and meal delivery services in order to prevent the Company's competitors from gaining market share in the run-up to the IPO. At the same time, the Offering Documents also failed to disclose that Uber was preparing to cut costs in key areas that would significantly undermine Uber's efforts to grow its core ridesharing and meal delivery business; and

(c)     The Company was in violation of and indifferent to existing and pending laws, rules, and regulations in multiple key markets, including in this state (California, where two of its five biggest markets –San Francisco and Los Angeles – are located), thereby exposing Uber to serious regulatory risks and costly liabilities that were either misleadingly understated or completely omitted from the Offering Documents. For example, the Offering Documents failed to adequately warn investors of the likelihood that Uber would have to reclassify its drivers as "employees" (rather than independent contractors) or the likely extent of the adverse impact of such reclassification on its operations (including, *inter alia*, the extent of the massive costs associated with having to pay past due and future unemployment, disability, and other employee benefits). Similarly, the Offering Documents failed to adequately address how Uber's business practices and policies subjected it to decreased revenue growth as a result of adverse regulatory actions by other local, state, and overseas jurisdictions that had the power to shut Uber out of otherwise lucrative and important markets.

3.     In the eight months since Uber's May 2019 IPO, and as the truth concerning the nature and extent of these and related material adverse problems has gradually been revealed, the price of Uber's Class A common stock has plummeted from the IPO Price of $45.00 per share. Indeed, the price of Uber shares fell below $34.00 (a decline of roughly 25% from the IPO Price) ***within just three months of the IPO***, and it continued to fall in the latter part of 2019.

4.     Plaintiffs bring this action under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against: (i) Uber; (ii) each of Uber's senior officers and directors who signed the Registration Statement (the "Individual Defendants," as further defined below); and (iii) each of the investment banks (the "Underwriter Defendants," as further defined below) that acted as underwriters for

the IPO.  The Securities Act protects investors and the capital markets of the United States by preventing companies and underwriters from issuing or offering shares to investors by means of materially inaccurate, misleading, or incomplete offering documents.

5.     As set forth herein, Plaintiffs allege that the Offering Documents contained materially untrue or misleading statements and/or omitted material information that was required to be stated therein. Defendant Uber, as the issuer of the securities at issue, is ***strictly liable*** for each such misstatement and material omission.  In addition, each Individual and Underwriter Defendant, in their capacities as signers of the Registration Statement and/or as statutory sellers, offerors, and/or underwriters of the shares sold pursuant to the IPO, is also strictly liable for every misstatement and material omission in the Offering Documents (except that each Individual and Underwriter Defendant may try to escape liability by establishing a "due diligence" affirmative defense).  Plaintiffs expressly disclaim any allegations that could be construed as alleging fraud or intentional or reckless misconduct on the part of any Defendant. By this action, Plaintiffs, on behalf of themselves and the Class (defined below) they seek to represent, seek a recovery for the substantial losses suffered in the wake of Uber's disastrous IPO.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Section 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

7.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

8.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

9.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

4

**PARTIES**

**A.     Plaintiffs**

10.     Plaintiff David Messinger ("Messinger") purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and IPO and was damaged thereby.  Plaintiff Messinger purchased his shares in the IPO from representatives of Defendant Morgan Stanley and in response to having been invited to indicate interest in the IPO by those representatives at the behest of Uber.

11.     Plaintiff Gerald Ashford purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and the IPO and was damaged thereby.

12.     Plaintiffs Irving S. and Judith Braun purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and the IPO and were damaged thereby.

13.     Plaintiff Ellie Marie Toronto ESA purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and the IPO and was damaged thereby.

14.     Plaintiff Varghese Pallathu purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and IPO and was damaged thereby.

15.     Plaintiff Joseph Cianci purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and the IPO and was damaged thereby.

16.     Plaintiff Johnny Ramey purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and the IPO and was damaged thereby.

**B.     Defendants**

**1.     Defendant Uber**

17.     Defendant Uber purports to be a technology company that is primarily in the business of facilitating access to rides and meals on demand.  Uber is based in San Francisco, California, but operates globally on six continents and in 700+ cities around the world.  Of these markets, as of the IPO, London (United Kingdom), Los Angeles, San Francisco, New York City, and São Paulo (Brazil) accounted for

5

nearly a quarter of Uber's total bookings.  Uber's Class A common shares ("Uber shares") are listed and traded on the NYSE under the ticker symbol "UBER."  Uber designated numerous personnel to serve as members of the working group for the IPO, including its Chief Executive Officer ("CEO") (Defendant Dara Khosrowshahi) and Chief Financial Officer ("CFO") (Defendant Nelson Chai), and Chief Accounting Officer ("CAO") (Defendant Glen Ceremony) who reviewed and approved the Offering Documents and participated in the preparation and delivery of road show presentations and related scripts or talking points.  Uber's representatives at the road show pitched investors in the IPO at meetings, during calls, and on webcasts.

### 2.  The Individual Defendants

18.  At the time of the IPO, Defendant Dara Khosrowshahi ("Khosrowshahi") was Uber's CEO and served as a member of Uber's board of directors (the "Board").  As the most senior Uber executive in the IPO working group, Defendant Khosrowshahi reviewed and approved, and participated in making, the statements in the Registration Statement, which he signed.  He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as Uber's CEO.

19.  At the time of the IPO, Defendant Nelson Chai ("Chai") was serving as Uber's CFO.  Defendant Chai reviewed and approved, and participated in making, statements in the Registration Statement, which he signed.  He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as Uber's CFO.

20.  At the time of the IPO, Defendant Glen Ceremony ("Ceremony") was serving as Uber's CAO.  Defendant Ceremony reviewed and approved, and participated in making, statements in the Registration Statement, which he signed.  He also reviewed, edited, and approved the IPO's road show PowerPoint presentation, road show talking points and script, and participated in making the materially inaccurate, misleading, and incomplete statements alleged herein as Uber's CAO.

21.  At the time of the IPO, Defendant Ronald Sugar ("Sugar") was serving as Chairperson of the Uber Board.  Defendant Sugar participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

22.     At the time of the IPO, Defendant Ursula Burns ("Burns") was serving as a director on the Uber Board.  Defendant Burns participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

23.     At the time of the IPO, Defendant Garrett Camp ("Camp"), a co-founder of the Company, was serving as a director on the Uber Board.  Defendant Camp participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

24.     At the time of the IPO, Defendant Matt Cohler ("Cohler") was serving as a director on the Uber Board.  Defendant Cohler participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

25.     At the time of the IPO, Defendant Ryan Graves ("Graves") was serving as a director on the Uber Board.  Defendant Graves participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

26.     At the time of the IPO, Defendant Arianna Huffington ("Huffington") was serving as a director on the Uber Board.  Defendant Huffington participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

27.     At the time of the IPO, Defendant Travis Kalanick ("Kalanick"), a co-founder of the Company and former Uber CEO, was serving as a director on the Uber Board.  Defendant Kalanick participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

28.     At the time of the IPO, Defendant Wan Ling Martello ("Martello") was serving as a director on the Uber Board.  Defendant Martello participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

29.     At the time of the IPO, Defendant H.E. Yasir Al-Rumayyan ("Al-Rumayyan") was serving as a director on the Uber Board.  Defendant Al-Rumayyan participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

30.     At the time of the IPO, Defendant John Thain ("Thain") was serving as a director on the Uber Board.  Defendant Thain participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

31.     At the time of the IPO, Defendant David Trujillo ("Trujillo") was serving as a director on the Uber Board.  Defendant Trujillo participated in the preparation of and signed, or authorized the signing of, the Registration Statement.

32.     Defendants Khosrowshahi, Chai, Ceremony, Sugar, Burns, Camp, Cohler, Graves, Huffington, Kalanick, Martello, Al-Rumayyan, Thain, and Trujillo are collectively referred to herein as the "Individual Defendants."

### 3.     The Underwriter Defendants

33.     The Underwriter Defendants were also instrumental in soliciting investors and in making the Uber shares that were offered and sold in the IPO available to the members of the Class.  The table below lists each of the 29 Underwriter Defendants, together with the number of allotted shares that each sold to Class members in the IPO:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 68,796,612 |
| Goldman Sachs & Co. LLC | 35,864,408 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 17,813,560 |
| Barclays Capital Inc. | 11,231,104 |
| Citigroup Global Markets Inc. | 11,231,104 |
| Allen & Company LLC | 10,296,610 |
| RBC Capital Markets, LLC | 2,994,961 |
| SunTrust Robinson Humphrey, Inc. | 2,745,763 |
| Deutsche Bank Securities Inc. | 2,745,763 |
| HSBC Securities (USA) Inc. | 2,288,136 |
| SMBC Nikko Securities America, Inc. | 1,525,424 |
| Mizuho Securities USA LLC | 1,525,424 |
| Needham & Company, LLC | 915,127 |
| Loop Capital Markets LLC | 838,983 |
| Siebert Cisneros Shank & Co., L.L.C. | 838,983 |
| Academy Securities, Inc. | 610,169 |
| BTIG, LLC | 610,169 |
| Canaccord Genuity LLC | 610,169 |
| CastleOak Securities, L.P. | 610,169 |
| Cowen and Company, LLC | 610,169 |
| Evercore Group L.L.C. | 665,547 |
| JMP Securities LLC | 610,169 |
| Macquarie Capital (USA) Inc. | 610,169 |
| Mischler Financial Group, Inc. | 610,169 |
| Oppenheimer & Co. Inc. | 665,547 |
| Raymond James & Associates, Inc. | 610,169 |

| Name | Number of Shares |
|---|---|
| William Blair & Company, L.L.C. | 610,169 |
| The Williams Capital Group, L.P. | 610,169 |
| TPG Capital BD, LLC | 305,085 |

34.     Defendant Morgan Stanley was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Morgan Stanley acted as a representative of all the underwriters.  Morgan Stanley also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Morgan Stanley's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Morgan Stanley conducts business in this District.

35.     Defendant Goldman Sachs was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Goldman Sachs acted as a representative of all the underwriters.  Goldman Sachs also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Goldman Sachs's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Goldman Sachs conducts business in this District.

36.     Defendant Merrill Lynch was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Merrill Lynch also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Merrill Lynch's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Merrill Lynch conducts business in this District.

37.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's

1    materially inaccurate, misleading, and incomplete Offering Documents.  Barclays also participated in

2    conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual

3    Defendants who participated in the roadshow, including lodging and travel, among other expenses.

4    Barclays's participation in and its solicitation of offers in connection with the IPO was motivated by its

5    financial interests.  Defendant Barclays conducts business in this District.

6        38.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the

7    Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

8    the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Citigroup also

9    participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the

10   Individual Defendants who participated in the roadshow, including lodging and travel, among other

11   expenses.  Citigroup's participation in and its solicitation of offers in connection with the IPO was

12   motivated by its financial interests.  Defendant Citigroup conducts business in this District.

13       39.    Defendant Allen & Company LLC ("Allen & Company") was an underwriter of the

14   Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

15   the Company's materially inaccurate, misleading, and incomplete Offering Documents.   Allen &

16   Company also participated in conducting and promoting the roadshow for the IPO and paying for the

17   expenses of the Individual Defendants who participated in the roadshow, including lodging and travel,

18   among other expenses.  Allen & Company's participation in and its solicitation of offers in connection

19   with the IPO was motivated by its financial interests.  Defendant Allen & Company conducts business in

20   this District.

21       40.    Defendant RBC Capital Markets, LLC ("RBC Capital") was an underwriter of the

22   Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

23   the Company's materially inaccurate, misleading, and incomplete Offering Documents.  RBC Capital also

24   participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the

25   Individual Defendants who participated in the roadshow, including lodging and travel, among other

26   expenses.  RBC Capital's participation in and its solicitation of offers in connection with the IPO was

27   motivated by its financial interests.  Defendant RBC Capital conducts business in this District.

28

10

41.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  SunTrust also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  SunTrust's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant SunTrust conducts business in this District.

42.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Deutsche Bank also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Deutsche Bank's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Deutsche Bank conducts business in this District.

43.     Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  HSBC also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. HSBC's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant HSBC conducts business in this District.

44.     Defendant SMBC Nikko Securities America, Inc. ("SMBC") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  SMBC also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  SMBC's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant SMBC conducts business in this District.

45.     Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Mizuho also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Mizuho's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Mizuho conducts business in this District.

46.     Defendant Needham & Company, LLC ("Needham") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Needham also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Needham's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Needham conducts business in this District.

47.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Loop Capital also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Loop Capital's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Loop Capital conducts business in this District.

48.     Defendant Siebert Cisneros Shank & Co., L.L.C. ("Siebert Cisneros") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Siebert Cisneros also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Siebert Cisneros's participation in and its solicitation of offers in connection with

the IPO was motivated by its financial interests.  Defendant Siebert Cisneros conducts business in this District.

49.    Defendant Academy Securities, Inc. ("Academy Securities") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Academy Securities also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Academy Securities' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Academy Securities conducts business in this District.

50.    Defendant BTIG, LLC ("BTIG") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  BTIG also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  BTIG's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant BTIG conducts business in this District.

51.    Defendant Canaccord Genuity LLC ("Canaccord Genuity") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Canaccord Genuity also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Canaccord Genuity's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Canaccord Genuity conducts business in this District.

52.    Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  CastleOak also participated in

conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. CastleOak's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant CastleOak conducts business in this District.

53.     Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Cowen also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Cowen's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Cowen conducts business in this District.

54.     Defendant Evercore Group L.L.C. ("Evercore") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Evercore also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Evercore's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Evercore conducts business in this District.

55.     Defendant JMP Securities LLC ("JMP Securities") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  JMP Securities also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  JMP Securities' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant JMP Securities conducts business in this District.

56.     Defendant Macquarie Capital (USA) Inc. ("Macquarie") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Macquarie also

1  participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the

2  Individual Defendants who participated in the roadshow, including lodging and travel, among other

3  expenses.  Macquarie's participation in and its solicitation of offers in connection with the IPO was

4  motivated by its financial interests.  Defendant Macquarie conducts business in this District.

5        57.    Defendant Mischler Financial Group, Inc. ("Mischler") was an underwriter of the

6  Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

7  the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Mischler also

8  participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the

9  Individual Defendants who participated in the roadshow, including lodging and travel, among other

10  expenses.  Mischler's participation in and its solicitation of offers in connection with the IPO was

11  motivated by its financial interests.  Defendant Mischler conducts business in this District.

12        58.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer") was an underwriter of the

13  Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

14  the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Oppenheimer

15  also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of

16  the Individual Defendants who participated in the roadshow, including lodging and travel, among other

17  expenses.  Oppenheimer's participation in and its solicitation of offers in connection with the IPO was

18  motivated by its financial interests.  Defendant Oppenheimer conducts business in this District.

19        59.    Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of

20  the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination

21  of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Raymond

22  James also participated in conducting and promoting the roadshow for the IPO and paying for the expenses

23  of the Individual Defendants who participated in the roadshow, including lodging and travel, among other

24  expenses.  Raymond James's participation in and its solicitation of offers in connection with the IPO was

25  motivated by its financial interests.  Defendant Raymond James conducts business in this District.

26        60.    Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the

27  Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

28  the Company's materially inaccurate, misleading, and incomplete Offering Documents.  William Blair

15

also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  William Blair's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant William Blair conducts business in this District.

61.     Defendant The Williams Capital Group, L.P. ("Williams Capital") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Williams Capital also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Williams Capital's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Williams Capital conducts business in this District.

62.     Defendant TPG Capital BD, LLC ("TPG Capital") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  TPG Capital also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  TPG Capital's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant TPG Capital conducts business in this District.

63.     Defendants listed in ¶¶33-62 are collectively referred to herein as the "Underwriter Defendants."

64.     Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.  In addition, although not an element of Plaintiffs' claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act.  Each

Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

65.     Each Underwriter Defendant named herein is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities.  As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees which, in the aggregate, exceeded $106 million.

66.     As underwriters, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading information, about the Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

67.     Representatives of the Underwriter Defendants also assisted Uber and the Individual Defendants in planning the IPO.  They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

68.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Uber's management, directors, and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Uber's Class A common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about Uber would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Uber's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of Uber's undisclosed then-existing problems and plans and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

69.    The Underwriter Defendants also demanded and obtained an agreement from Uber under which Uber agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Uber purchased tens of millions of dollars in directors' and officers' liability insurance.

70.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the IPO, so that they and the other Defendants could offer to sell, and sell, Uber shares to Plaintiffs and the members of the Class pursuant (or traceable) to the Offering Documents.

71.    Uber, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.    FACTUAL BACKGROUND

#### A.    Uber's Business

72.    Uber purports to be committed to "setting the world in motion."  The foundation of Uber's business is a platform that connects its network of consumers and drivers, who use Uber's "app," to arrange for rides (whether by car, auto rickshaw, motorbike, minibus, taxi, or other vehicle) from drivers willing to provide them.  Uber also offers other modes of ridesharing transportation, including dockless e-bikes and e-scooters.  In addition, the Company offers "Uber Eats," a meal delivery service, in select markets throughout the United States and other parts of the world, as well as "Uber Freight," an on-demand marketplace connecting shippers and carriers.

73.    Uber recruits and approves all of the drivers (hereinafter, "Uber Drivers" or "Drivers") who perform services for Uber's customers.  Having a large fleet of Drivers is critical to Uber's business. To recruit and maintain a large fleet of Drivers, Uber provides incentives to the Drivers (which are separate from and in addition to the Driver's portion of the fare paid by the customer).  Driver incentives could include, for example, payments to Drivers for completing a certain number of trips over a fixed period of time set by an Uber promotion or paying an additional amount (such as $10.00 a ride) for each of a Driver's first 100 rides.

74. The Company also sets the rates that Drivers charge to Uber's customers for providing transportation or food delivery services and arranges for customer payments to be processed by credit card or other electronic payment systems. The Company then collects revenue by retaining a portion of the fares that the customers have been charged for the services provided to them by their Drivers. For Uber to maximize its revenue, the Company must both build and then maintain a sufficiently large supply of Drivers in any given market to meet customers' demands for transportation and food delivery services in that market (otherwise, a shortage of Drivers is likely to lead to poor business, as customers would have to experience unacceptably long wait times for service).

75. Uber sets its Drivers' fares (*i.e.*, the rate that customers pay) in each city using a proprietary Uber formula based on either a per-mile or per-minute rate on top of a base fare. As part of its pricing formula, Uber charges Drivers a service fee for each trip, which Uber calculates as a percentage of its Drivers' total fare for the trip, usually 20%. Prior to calculating its service fee, Uber also charges each Driver a one dollar "safe rides" fee on each fare, purportedly to cover the cost of screening Drivers (and their vehicles) for safety. Because the "app" that Uber customers use to obtain services is set up in a manner such that customers actually make their payments for services directly to Uber (using a credit card or an electronic third-party payment service, such as ApplePay), Uber is able to (and does) deduct all of the fees it charges its Drivers from the amounts that Uber ultimately remits to each of its Drivers.

76. Despite exerting all of this control, as of the IPO, Uber classified (and has continued to fight determinedly to fight to classify) its Drivers as "independent contractors," rather than as employees. In the years leading up to Uber's IPO, the Company faced a series of legal proceedings filed by Drivers seeking to be recognized as Uber employees.

**B. Uber's Prior History of a Toxic Corporate Culture and Susceptibility to Severe Reputational Harm**

77. Prior to the commencement of later efforts to take the Company public, Uber's co-founder, Defendant Kalanick, served as Uber's CEO. During Kalanick's tenure as CEO, Uber was beset by a number of scandals related to the Company's toxic corporate culture, as a significant number of corporate employees (*e.g.*, managers, software engineers, programmers, and other persons who served the Company in *non*-Driver positions) alleged that they were victims of sexual harassment and other inappropriate

19

conduct by their superiors or co-workers.  For example, in a particularly well-publicized episode in the first part of 2017, a former software engineer at Uber alleged that she had been sexually harassed, which led to many other complaints about Uber's workplace culture being made.  The software engineer's story, first published on her personal blog, quickly attracted wide attention and helped paint Uber as a poorly led company plagued by rampant misogyny, with a human resources department that conspired to work with senior management to protect abusive managers from being disciplined if they were otherwise high performers.  Such reports contributed to a public relations nightmare for the Company and were supplemented by online discussions and postings of further allegations of systemic sexism, rampant harassment, and a "toxic" corporate culture" at Uber.

78.     This adverse public attention, in turn, fueled the viral Twitter "#DeleteUber" movement online, in which Uber users urged others to stop using Uber.  Uber competitor Lyft, Inc. ("Lyft") also seized on these developments to launch its own marketing efforts to portray Lyft as the "woke" (and morally superior) alternative to Uber.  The adverse publicity also became so sufficiently intense that Uber hired outside counsel, former U.S. Attorney General Eric Holder ("AG Holder"), to undertake an internal investigation into Uber's workplace culture.  AG Holder, who led the investigation, ultimately issued a critical report that included numerous recommended corporate reforms, beginning with re-allocating certain management responsibilities away from the then-CEO, Defendant Kalanick, who was widely perceived has having personally flouted workplace rules and norms and setting a dismal "tone at the top" in terms of being sensitive to how employees were treated.  Holder also recommend that Uber: rewrite the Company's written cultural values to "reflect more inclusive and positive behaviors"; add more independent board members and create an independent non-executive chair of the board position; implement a "robust and effective complaint process"; take into account executives' handling of workplace culture and complaints in setting their compensation; and appoint a committee to oversee the effective implementation of Uber's new workplace policies and procedures.

79.     To limit the risk of still further severe adverse negative publicity and legal liability, in August 2017, Uber's Board also announced that it was replacing Defendant Kalanick as CEO with an Uber-outsider, Defendant Khosrowshahi (who had previously served as President and CEO of Expedia, Inc.).  According to reports, Defendant Khosrowshahi had been recruited primarily to improve Uber's

image and to lead Uber through a successful IPO. Indeed, in addition to agreeing to pay Khosrowshahi $45 million in cash and restricted stock, Uber's Board agreed to an unusual contractual provision providing that Khosrowshahi would receive an ***additional*** payout of $80 million to $100 million *if* Uber were to maintain a market capitalization of at least $120 billion for at least three months during the next five years.

### C.   Uber's IPO

80.     On April 11, 2019, Uber filed a draft Registration Statement on Form S-1 with the SEC for the IPO.

81.     On May 9, 2019, the SEC declared the Registration Statement for the IPO, as amended, effective.

82.     On or about May 10, 2019, Uber and the Underwriter Defendants priced the IPO at $45 per share.  On May 13, 2019, Uber filed the final Prospectus for the IPO, which forms part of the Registration Statement.  Uber's IPO closed on or about May 14, 2019.

83.     In the IPO, the Company sold 180,000,000 shares of its Class A common stock at the IPO Price of $45.00 per share, resulting in total proceeds of approximately $7.994 ***billion***, net of underwriting discounts and commissions of $106,200,000 that were paid to the Underwriter Defendants.  In addition, Uber granted the Underwriter Defendants a "greenshoe option," which, in this case, gave the Underwriters an option to sell another 27 million shares pursuant to the Offering Documents.  Defendants Morgan Stanley and Goldman Sachs pre-sold the 27 million additional "greenshoe" shares to investors in the IPO.

## II.   THE OFFERING DOCUMENTS CONTAINED MATERIALLY UNTRUE AND MISLEADING STATEMENTS

84.     The Offering Documents used to effectuate Uber's IPO, as well as the road show talking points and script used in conjunction with presenting the road show PowerPoint presentation for the IPO, contained materially untrue or misleading statements of material facts and/or omitted to state various facts necessary to make the statements made therein not materially misleading or incomplete in violation of the Securities Act.  In particular, and as set forth below, the statements in these materials were materially inaccurate, misleading, and/or incomplete with respect to: (i) the nature and extent of Uber's serious safety problems (including literally thousands of reported sexual assaults, rapes, and other serious criminal

misconduct by Uber Drivers against Uber customers), and the Company's patently defective investigative and "enforcement" procedures for responding to such customer reports; (ii) the Company's financial performance and prospects, including that the Company was on track to suffer record losses of **over $5 billion** in the quarter of the IPO (and a more than **doubling** of the Company's "adjusted EBITDA" loss to -$625 million) and that Uber was largely trapped in a vicious cycle whereby, in order to grow revenue and market share, it had to maintain or increase its payments of expensive "Driver incentives" (to recruit and retain new and existing Drivers), but that it could not meaningfully grow revenue or market share without experiencing accelerating loss rates and declining margins as a result of these incentives; and (iii) the nature and extent of the Company's violation of and indifference to existing and pending laws, rules, and regulations in numerous critical markets, which, among other things: (a) made it likely that Uber's core businesses (which relied on treating most of its Drivers as "independent contractors," rather than as "employees," so that Uber could avoid having to pay, for example, ***roughly half a billion dollars per year*** in additional compensation and benefits to its Drivers in California alone) would become massively unprofitable; (b) caused the Company to budget vast sums (measureable in multiple tens of millions of dollars) to try to reverse adverse regulatory actions, neutralize unfavorable court decisions, and block imminent legislative changes to try to stave off legal and regulatory developments that, unbeknownst to investors, posed an existential threat to Uber's core businesses; (c) were so severe that the Company's licenses to operate in key metropolitans, such as London, would likely not be renewed; and (d) had exposed the Company to massive tax liabilities, fines, and related interest and penalties (including, but not limited to, roughly $650 million in tax payments owed to New Jersey alone, consistent with an adverse pre-IPO New Jersey court decision that was not mentioned in the Offering Documents).

**A.  Misstatements and Omissions Regarding the Nature and Extent of Sexual Assaults and Other Abuses by Uber Drivers and Uber's Inadequate Investigative Safety Policies and Procedures**

85.  According to the Offering Documents, "[c]onsumers choose to use [Uber's] Ridesharing products based primarily upon a combination" of factors, including "quality of service, safety," and "support," making them each paramount to the success of the Company's core business.

86.  Indeed, the Offering Documents repeatedly stressed the importance of these factors to its business and touted, for example, Uber's purported efforts to "rebuild[] [its] relationships with . . .

consumers, cities, and regulators[,]" as well as its pledge to "work tirelessly to earn [its] customers' trust and business."

87.     These same themes were repeated by Uber and its executives in Uber's road show talking points and script, which accompanied Uber's IPO's road show PowerPoint presentation.  For example, Defendant Khosrowshahi claimed:

> Uber sets a standard for powering movement on demand. Our apps, with our continually evolving features and functionality, present users with a contextual, intuitive interface that not only provide riders a ride or drivers a fare, ***but also enables safety and trust. Uber strives to provide the safest and most dependable mobility platform out there, allowing us to provide a highly differentiated experience that builds trust and loyalty.***[1]

88.     Similarly, Uber's Chief Legal Officer ("CLO"), Tony West ("West"), claimed:

> As part of our new path forward, we've been ***strengthening our relationships with regulators by emphasizing safety, transparency, and accountability. We have a responsibility to help keep people safe and it's one that we take seriously***.
>
> Over the last year we've launched new safety features, changed our arbitration policies, implemented numerous measures to better support our consumers, and in the United Sates we've strengthened our background checks. But when it comes to safety, our work is never done. ***We will continue to be a leader in setting new standards*** and using technology to increase the safety of our platform.

89.     The Offering Documents further represented, following a list of four key elements to help it "set[] the world in motion," that its "Product expertise" is "built with the expertise that allows us to set the standard for powering movement on-demand, provide platform users with a contextual, intuitive interface, continually evolve features and functionality, ***and deliver safety and trust.***"

90.     Further stressing the importance of ***safety and trust*** to the Company's business and operations, the Offering Documents also stated as follows:

> [W]e work towards our mission based on eight cultural norms. Our team came together to write these norms from the ground up ***to reflect who we are*** and where we are going:
>
> **[1]** ***We do the right thing. Period.***
>
>         * * *
>
> **[2]** ***We are customer obsessed. We work tirelessly to earn our customers' trust and business*** by solving their problems, maximizing their earnings, or lowering their costs. We surprise and delight them. ***We make short-term sacrifices for a lifetime of loyalty***.

---

[1]     All emphases in materials quoted herein are added, with original emphases removed, unless otherwise indicated.

\* \* \*

**[3]** We act like owners. ***We seek out problems, and we solve them. We help each other and those who matter to us. We have a bias for action and accountability.*** We finish what we start, and we build Uber to last. ***And when we make mistakes, we'll own up to them.***

91.    In addition, the Offering Documents represented, with respect to its ridesharing products, that Uber "strive[s] to create an experience that is ***safe***, reliable, affordable, and convenient[,]" stressing, in particular, Uber's goal "to make riding in an Uber ***a safe transportation option*** in any city" and that "[f]rom pick up to arrival, we strive ***to enable a safe experience for riders by providing transparency, real-time tracking, feedback, and rapid incident response systems***."

92.    As the Offering Documents further represented: "We receive all rider feedback and ***are committed to rapidly responding to any reported safety incidents with trained teams available 24 hours a day***."

93.    Additionally, the Offering Documents further represented that Uber "design[s] [its] products to include robust safety tools for all platform users" and cited, for example, its launch in 2018 of the "Safety Toolkit, which allows both Drivers and consumers to access a menu of safety features directly from the home screen of our app."  The Offering Documents also described its purportedly then-existing commitment to safety as follows:

With over 150 employees focused on building new technologies ***that put safety at the heart of the Uber experience***, and thousands of community operations employees ***dedicated to ensuring safety*** on our platform, ***we are committed to enhancing safety***. To that end, we have formed a Safety Advisory Board composed of outside experts, added additional safety features to our platform, and have strengthened our background checks in the United States. In December 2018, we introduced our partnership with Crime Stoppers International in a few cities across the United States, Canada, and Latin America to provide ***Drivers*** with tools to report criminal activity while keeping their identities anonymous. We strive to ***promote the safety of our*** employees, Drivers, and ***consumers***.

94.    The Offering Documents affirmatively stated: "***We also take certain measures to . . . help increase safety . . . including terminating access to our platform for users with low ratings or reported incidents***[.]"

95.    However, the statements in ¶¶85-94 concerning, *e.g.*, Uber's ability to deliver "safety and trust" were materially inaccurate, misleading, and/or incomplete because, among other things, they failed to disclose the thousands of sexual assaults, including rapes and attempted rapes, perpetrated against Uber

24

customers by Uber Drivers from 2017 and 2018.  Indeed, as would only be disclosed after the IPO, during just the two full calendar years immediately prior to the IPO, Uber received **_5,981 reports_** of sexual assault, including **_464 reports of actual or potential rape by platform users within the United States._**  Although these figures also included reports of miscreant acts by customers against Drivers, most of these roughly 6,000 reports involved acts of sexual violence or other serious sexual misconduct directed by Drivers against **_Uber customers_**.

96.     In addition, the Offering Documents' representations in ¶¶85-94 concerning always "doing the right thing," its purported commitment to prioritizing "customer trust and safety," and its purported practice of "terminating access to our platform for [Drivers] with . . . reported incidents" were materially inaccurate, misleading, and/or incomplete because, among other things, they failed to give investors materially accurate or complete information concerning Uber's actual safety practices and procedures.  To the contrary, unbeknownst to investors at the time of the IPO, Uber's safety and related response and enforcement policies and practices were patently defective – and geared towards "protecting Uber first" at the expense of passenger safety.  For example, at Uber's direction, its SIU – a group of agents tasked with handling some of the worst incidents that occurred during Uber rides – consistently operated in a manner that placed the Company's interest in avoiding adverse publicity and trying to limit Uber's legal exposure ahead of passenger safety.  Indeed, Uber actually **_prohibited_** SIU agents from forwarding customer reports of sexual assault by Uber Drivers to police or other law enforcement authorities and also barred its SIU agents from advising Uber customers who were victims of Driver misconduct to seek legal counsel or submit their own police report.  Such reprehensible practices also belied the Offering Documents' representations that Uber had "a bias for action and accountability."  The Offering Documents also did not reveal that the hiring practices for members of its SIU were so lax that Uber had hired agents that lacked adequate experience in either investigating sexual assaults or assisting victims of such offenses.

97.     Moreover, as investors learned only after the IPO, Uber's safety practices were so defective that they routinely gave Uber Drivers who were the subject of sexual assault or harassment reports the benefit of a "three strikes" policy before they would be terminated.  Indeed, as later reported in a shocking exposé by *The Washington Post* on September 25, 2019 (the "*WaPo* Article"):

***Uber relies on a three-strikes system that can allow bad actors — both drivers and riders — to keep using the app until three uncorroborated allegations are made,*** according to the more than 20 current and former investigators. For more egregious claims, ***it is generally two such strikes,*** they said. Without corroborating evidence, such as a police report or rape kit, they said, ***they don't have the time, resources or encouragement to delve deeply into most allegations***.

The *WaPo* Article also went on to report that, according to investigators, "[e]ven the strikes system can be superseded by Uber executives who may be motivated to keep as many drivers on the road as possible[.]"

98.     In the years leading up to the IPO, Uber's failure to adopt programs and policies that were actually designed to promote safety and accountability (for example, by ensuring that likely sexual predators were promptly investigated, terminated, and reported, so that they would not threaten future passengers) was apparently due, in part, to Uber's concerns that implementation of more proactive safety and accountability policies would increase the likelihood that Uber Drivers would be classified as "employees" rather than independent contractors.  Such a re-classification would, in turn, trigger increased legal liability exposure for Uber and also require Uber to pay greater compensation and benefits to its Drivers.  Indeed, at the time of the IPO, Uber was actively fighting cases brought by drivers both overseas and in the United States (as well as legislative proposals in the state of California and elsewhere), to make it easier to classify Uber Drivers as "employees" rather than as "independent contractors."  *See infra* §III.C.  In other words, by, for example, establishing strict behavioral rules for its Drivers, requiring them to take appropriate sexual harassment training, and implementing effective enforcement procedures to discipline, terminate, and/or report Drivers who committed sexual assaults or other abuses, Uber would have increased the risk that its Drivers would be deemed subject to Uber's supervision and control and hence considered employees.  In all events, regardless of the reasons for Uber's patently defective and inadequate safety and related reporting and enforcement procedures, the Offering Documents' representations in this regard were materially inaccurate, misleading, and incomplete and plagued by material omissions.

99.     Additionally, although the Company had significant material adverse information concerning the true nature and extent of sexual assault and other criminal acts committed by its Drivers against its customers during the two calendar years immediately prior to its May 2019 IPO, the Offering

Documents (rather than provide this information) simply contained generalized and wholly inadequate statements of "Risk Factors" concerning safety-related matters.  For example, the Offering Documents warned that Uber's business might suffer **_if_** it failed to provide "high-quality support" to customers who were victims of "safety incidents," stating:

> **_If we are unable to attract or maintain a critical mass of Drivers, consumers, restaurants, shippers, and carriers, whether as a result of competition or other factors, our platform will become less appealing to platform users, and our financial results would be adversely impacted_**.
>
> Our success in a given geographic market significantly depends on our ability to maintain or increase our network scale and liquidity in that geographic market by attracting Drivers, consumers, restaurants, shippers, and carriers to our platform.
>
> \* \* \*
>
> In addition, **_if_** we are unable to provide high-quality support to platform users or respond to reported incidents, including safety incidents, in a timely and acceptable manner, our ability to attract and retain platform users **_could_** be adversely affected.
>
> \* \* \*
>
> Furthermore, **_if Drivers . . . are involved in incidents regarding safety or privacy, engage in malfeasance, or otherwise violate the law_**, we **_may_** receive unfavorable press coverage and our reputation and business **_may_** be harmed. As a result, any of these third parties **_could_** take actions that result in harm to our brand, reputation, and consequently our business.

100.    The Offering Documents also conceded that Uber's brand and reputation were "critical" to its success.  For example, the Offering Documents stated:

> **_Maintaining and enhancing our brand and reputation is critical to our business prospects. We have previously received significant media coverage and negative publicity, particularly in 2017, regarding our brand and reputation, and failure to rehabilitate our brand and reputation will cause our business to suffer._**
>
> Maintaining and enhancing our brand and reputation is critical to our ability to attract new employees and platform users, to preserve and deepen the engagement of our existing employees and platform users, and to mitigate legislative or regulatory scrutiny, litigation, government investigations, and adverse platform user sentiment.
>
> We have previously received a high degree of negative media coverage around the world, which has adversely affected our brand and reputation and fueled distrust of our company. In 2017, the #DeleteUber campaign prompted hundreds of thousands of consumers to stop using our platform within days. [*See also* ¶¶77-79 *supra*.] Subsequently, our reputation was further harmed when an employee published a blog post alleging, among other things, that we had a toxic culture and that certain sexual harassment and discriminatory practices occurred in our workplace. . . . These events and the public response to such events, as well as other negative publicity we have faced in recent years, have adversely affected our brand and reputation, which makes it difficult for us to attract and retain platform users, reduces confidence in and use of our products and offerings, invites legislative and regulatory scrutiny, and results in litigation and governmental investigations. Concurrently with and

after these events, our competitors raised additional capital, increased their investments in certain markets, and improved their category positions and market shares, and may continue to do so.

\* \* \*

While we have taken significant steps to rehabilitate our brand and reputation, the successful rehabilitation of our brand will depend largely on maintaining a good reputation, minimizing the number of safety incidents, improving our culture and workplace practices, improving our compliance programs, maintaining a high quality of service and ethical behavior, and continuing our marketing and public relations efforts. Our brand promotion, reputation building, and media strategies have involved significant costs and may not be successful. We anticipate that other competitors and potential competitors will expand their offerings, which will make maintaining and enhancing our reputation and brand increasingly more difficult and expensive. *If* we fail to successfully rehabilitate our brand in the current or future competitive environment or *if* events similar to those that occurred in 2017 occur in the future, our brand and reputation *would* be further damaged and our business *may* suffer.

Significantly, however, this discussion of a need to "maintain and enhance" Uber's brand and reputation focused on the well-publicized allegations of a toxic workforce environment within the Company (*see* ¶¶77-79 *supra*), rather than on the even more serious issue (including from a public relations standpoint) of the sexual assault dangers that Uber *customers* faced when they utilized Uber's services.

101.    Instead, and rather than provide material information regarding the nature and shocking extent of the information it possessed concerning sexual assaults that had been reported to the Company (albeit just from within the United States) in the two years immediately preceding the IPO, the Offering Documents stated that Uber simply "planned" to provide such "data" at some "later" point in 2019 *after the IPO*.  Specifically, the Offering Documents stated:

> *In 2019, we plan to release a transparency report, which will provide the public with data related to reports of sexual assaults and other safety incidents claimed to have occurred on our platform in the United States*. The public responses to this transparency report or similar public reporting of safety incidents claimed to have occurred on our platform, which may include disclosure of reports provided to regulators, *may* result in negative media coverage and increased regulatory scrutiny and *could* adversely affect our reputation with platform users. Further unfavorable media coverage and negative publicity *could* adversely impact our financial results and future prospects. As our platform continues to scale and becomes increasingly interconnected, resulting in increased media coverage and public awareness of our brand, future damage to our brand and reputation *could* have an amplified effect on our various platform offerings.

Such "disclosure," however, provided no information as to the *then-existing* nature and extent of reports of serious "safety incidents."  Nor did such disclosures constitute a meaningful "risk warning;" to the contrary, for the Offering Documents to generically warn that the Company "might" be subject to negative

28

repercussions from announcement of more data was itself misleading, as the Company was ***already*** aware of such serious adverse safety data that damaging negative media coverage and increased regulatory scrutiny was not merely highly probable, but indeed all but certain.

102.   The Offering Documents also stated the following with regard to potential liability related to criminal, violent, inappropriate, or dangerous activity that "might" result in Uber customers becoming victims of serious misconduct perpetrated against them by Uber Drivers:

> ***If platform users . . . are subject to[] criminal, violent, inappropriate, or dangerous activity that results in major safety incidents, our ability to attract and retain . . . consumers, restaurants, shippers, and carriers may be harmed, which could have an adverse impact on our reputation, business, financial condition, and operating results.***
>
> ***We are not able to control or predict the actions of platform users*** and third parties, either during their use of our platform or otherwise, ***and we may be unable to protect or provide a safe environment for Drivers and consumers as a result of certain actions by Drivers***, consumers, restaurants, carriers, and third parties. Such actions ***may*** result in injuries, property damage, or loss of life for consumers and third parties, or business interruption, brand and reputational damage, or significant liabilities for us. Although we administer certain qualification processes for users of the platform, including background checks on Drivers through third-party service providers, these qualification processes and background checks may not expose all potentially relevant information and are limited in certain jurisdictions according to national and local laws, and our third-party service providers may fail to conduct such background checks adequately or disclose information that could be relevant to a determination of eligibility[.] . . . In addition, we do not independently test Drivers' driving skills. Consequently, we expect to continue to receive complaints from riders and other consumers, as well as actual or threatened legal action against us related to Driver conduct. We have also faced civil litigation alleging, among other things, inadequate Driver qualification processes and background checks, and general misrepresentations regarding the safety of our platform.
>
> ***If*** Drivers or carriers, or individuals impersonating Drivers or carriers, engage in criminal activity, misconduct, or inappropriate conduct or use our platform as a conduit for criminal activity, consumers and shippers may not consider our products and offerings safe, and we ***may*** receive negative press coverage as a result of our business relationship with such Driver or carrier, which would adversely impact our brand, reputation, and business. ***There have been numerous incidents and allegations worldwide of Drivers, or individuals impersonating Drivers, sexually assaulting, abusing, and kidnapping consumers, or otherwise engaging in criminal activity while using our platform***. ***For example, in December 2014, a Driver in New Delhi, India kidnapped and raped a female consumer, and was convicted in October 2015***. Furthermore, if consumers engage in criminal activity or misconduct while using our platform, Drivers and restaurants may be unwilling to continue using our platform. In addition, certain regions where we operate have high rates of violent crime, which has impacted Drivers and consumers in those regions. For example, ***in Latin America***, there have been numerous and increasing reports of Drivers and consumers being victimized by violent crime, such as armed robbery, violent assault, and rape, while taking or providing a trip on our platform. ***If*** other criminal, inappropriate, or other negative incidents occur due to the conduct of platform users or third parties, our ability to attract platform users ***may*** be harmed, and our business and financial results ***could*** be adversely affected.

103.    However, like the statements quoted *supra* in ¶¶99-101, such "disclosure" provided no meaningful information as to the **then-existing** nature and extent of reports of serious "safety incidents." Nor did such disclosures constitute a meaningful "risk warning"; to the contrary, these supposed "risk factors" were themselves materially inaccurate, misleading, and/or incomplete because they suggested that there was only a contingent possibility of significant safety problems and adverse safety reports, when, in fact, the "risk" of serious safety reports (and particularly those involving sexual assaults) on a massive scale had already materialized as of the IPO.   Moreover, the above-quoted "risk factor" disclosure was also materially misleading in that it specifically referenced only a single (and four and one-half year-old) rape that had occurred **in India** and increasing reports of "violent crime" in Latin America – but without providing any context as to the extent to which serious sexual assaults and other criminal conduct had been reported in Uber's most important market – the United States.   Similarly, the Offering Documents' vague reference to "numerous incidents and allegations worldwide" concerning Drivers (or persons impersonating Drivers) engaging in criminal activity did not reveal the shocking extent of the safety problems that Uber was experiencing in just the United States (which, unlike "Latin America," was not identified as one of the "regions" where Uber operated that "ha[s] high rates of violent crime").

104.    As of the IPO, Defendants were already well aware of the severe harm that the Company had experienced in response to allegations of sexual harassment committed by Uber employees against other Uber employees **within** the Company, which had led to (among other things) the extremely damaging online "#DeleteUber" movement two years earlier in 2017.   In such circumstances, the materiality to investors of adverse information concerning the nature and extent of reported Driver sexual assaults and other mistreatment **of Uber's *customers*** is indisputable.   Yet, rather than provide such information (or even such information for just the United States), the Offering Documents misled investors by failing to disclose it and merely "warning" that Uber might experience a shockingly large number of "safety incident" reports in the future – even though Uber had already experienced a shockingly large number of such reports, and from just within the United States, in each of the two years immediately preceding the IPO.

105.    Similarly, the Offering Documents were materially misleading and incomplete because they did not reveal the extent to which Uber's safety policies and practices failed to protect its users by,

among other things, prohibiting Uber investigators from reporting criminal misconduct to the police, prohibiting its investigators from encouraging Uber customers from filing their own police reports, and allowing even the worst Uber Drivers to have two, three, or even more "strikes" before being disciplined, terminated, and/or reported to authorities.  Such patently defective policies and practices also belied the Offering Documents' statements concerning Uber's purported commitment to "safety" and "customer trust" and further exposed Uber to devastating adverse reputational harm.

**B.    Misstatements and Omissions Regarding Uber's Financial Performance and Reporting**

106.    As stated above, Uber's IPO took place on May 10, 2019, and closed on May 14, 2019. Uber's 2Q2019 – a quarter that was almost halfway over at the time of the IPO – closed on June 30, 2019.

107.    The Offering Documents provided a list of key metrics that Uber urged investors to consider when assessing the financial health of the Company and its operating performance, including "Adjusted Net Revenue" and "Take Rate," both of which are non-GAAP (Generally Accepted Accounting Principles) financial measures.  The Offering Documents defined "Adjusted Net Revenue" ("ANR") as revenue (i) less excess the dollar value of "Driver incentives" (described as incentives offered and paid by Uber to its Drivers to encourage Driver activity on the Company's platform[2]); and (ii) less the value of "Driver referrals" (described as "payments that [Uber] make[s] to existing Drivers to refer new Drivers onto [its] platform").  The Offering Documents further defined "Take Rate" as "Adjusted Net Revenue [ANR] as a percentage of Gross Bookings" (where "Gross Bookings" is defined "as the total dollar value, including any applicable taxes, tolls, and fees, of Ridesharing and New Mobility rides, Uber Eats meal deliveries, and amounts paid by shippers for Uber Freight shipments, in each case without any adjustment for consumer discounts and refunds, Driver and restaurant earnings, and Driver incentives").  Finally, the Offering Documents defined "Core Platform Adjusted Net Revenue" (a subset of ANR) as revenue from

---

[2]    More specifically, the Offering Documents defined "Driver incentives" as follows: "Driver incentives refer to payments that we make to Drivers, which are separate from and in addition to the Driver's portion of the fare paid by the consumer. For example, Driver incentives could include payments we make to Drivers should they choose to take advantage of an incentive offer and complete a consecutive number of trips or a cumulative number of trips on the platform over a defined period of time. Driver incentives are recorded as a reduction of revenue to the extent they are not excess Driver incentives." *See infra* ¶111 for the definition of "Excess Driver incentives."

its two operating segments (consisting primarily of ridesharing and Uber Eats) "less (i) excess Driver incentives and (ii) Driver referrals."

108.    Underscoring the importance of these metrics to evaluate the financial health of Uber and its operating performance, the Offering Documents represented that Uber "believe[d] that [ANR and Core Platform ANR] are informative of [its] top line performance because they measure the total net financial activity reflected in the amount earned by [Uber] after taking into account all Driver and restaurant earnings, Driver incentives, and Driver referrals."

109.    The Offering Documents also provided tables that showed Uber's financial results for the calendar years 2016 through 2018, including the following:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 (in millions) | 2018 |
| **Adjusted Net Revenue reconciliation:** | | | |
| Revenue | $3,845 | $7,932 | $11,270 |
| Deduct: | | | |
|     Excess Driver incentives | (507) | (530) | (837) |
|     Driver referrals | (167) | (199) | (136) |
| Adjusted Net Revenue | $3,171 | $7,203 | $10,297 |

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 (in millions) | 2018 |
| **Core Platform Adjusted Net Revenue reconciliation:** | | | |
| Core Platform revenue | $3,844 | $7,865 | $10,897 |
| Deduct: | | | |
|     Excess Driver incentives | (507) | (530) | (837) |
|     Driver referrals | (167) | (199) | (136) |
| Core Platform Adjusted Net Revenue | $3,170 | $7,136 | $ 9,924 |

110.    The Offering Documents went on to provide more specific historical results, juxtaposing them with illustrations of a rapid and continuing growth trajectory:

In 2018, Gross Bookings grew to $49.8 billion, up 45% from $34.4 billion in 2017. Over the same period, revenue reached $11.3 billion, up 42% from $7.9 billion in the prior year. Core Platform Adjusted Net Revenue was $9.9 billion in 2018, up 39% from $7.1 billion in 2017. Net income (loss) was $1.0 billion in 2018 and $(4.0) billion in 2017. Adjusted EBITDA was $(1.8) billion in 2018 and $(2.6) billion in 2017.

32



111.    The Offering Documents highlighted Uber's desire and commitment to motivate drivers and customer to use its platform (rather than the platforms of other well-funded competitors, such as Lyft and GrubHub) in both the ridesharing and food delivery markets.  Central to these efforts was its use of "Driver incentives" (including "Excess Driver incentives) and "Driver Referrals," which the Offering Documents further described as follows:

> Excess Driver incentives refer to cumulative payments, including incentives but excluding Driver referrals, to a Driver that exceed the cumulative revenue that we recognize from a Driver with no future guarantee of additional revenue. Cumulative payments to a Driver could exceed cumulative revenue from a Driver as a result of Driver incentives or when the amount paid to a Driver for a Trip exceeds the fare charged to the consumer. Further, cumulative payments to Drivers for Uber Eats deliveries historically have exceeded the cumulative delivery fees paid by consumers. ***Excess Driver incentives are recorded in cost of revenue***, exclusive of depreciation and amortization. ***Driver referrals are recorded in sales and marketing expenses***. Management views Driver incentives and Driver referrals as Driver payments in the aggregate, whether they are classified as Driver incentives, excess Driver incentives, or Driver referrals.

These amounts largely depend on our business decisions. ***We include these amounts in Adjusted Net Revenue as it is useful to evaluate how increasing or decreasing incentives would impact our top line performance, and the overall net financial activity between us and our customers, which ultimately impacts our Take Rate***.

112.    The Offering Documents also described when Uber uses these incentives and referrals and the impact that these incentives and referrals have on the Company's ability to increase scale and create category leadership and a margin advantage as follows:

We believe that our scale and platform provide us with important advantages. Generally, for a given geographic market, we believe that the operator with the larger network will have a higher margin than the operator with the smaller network, as a result of lower costs due to greater scale. ***To the extent that competing ridesharing category participants choose to shift their strategy towards shorter-term profitability by reducing their incentives or employing other means of increasing their take rate, we believe that we would not be required to invest as heavily in Driver incentives and consumer discounts and promotions given the impact of price and Driver earnings on consumer and Driver behavior, respectively***. ***In addition to competing against ridesharing category participants, we also expect to use Driver incentives and consumer discounts and promotions to grow our business*** relative to lower-priced alternatives, such as personal vehicle ownership and usage, and to balance Driver supply and consumer demand.

***We can adjust both the service fee paid by Drivers and the Driver incentives that we offer to balance Driver supply according to consumer demand and to compete against other category participants. Both the service fee paid by Drivers and the Driver incentives affect our Take Rate, which in turn affects Core Platform Adjusted Net Revenue. Ultimately, we are focused on increasing Core Platform Adjusted Net Revenue and our Take Rate.***

*   *   *

When we enter a new city or launch a new Ridesharing product in a city, we aim to reach efficient scale and liquidity rapidly to attract consumers to use our platform as an alternative to personal vehicle ownership and usage of other modes of transportation and to achieve leadership in the ridesharing category. ***We can choose to use incentives, such as promotions for Drivers and consumers, to attract platform users on both sides of our network and increase engagement***, which can result in a negative margin until we reach sufficient scale to reduce incentives. Even after we reach efficient scale in a given market, ***we may need to continue to use incentives to compete***. In certain markets, other operators may use incentives to attempt to mitigate the advantages of our more liquid network, and ***we will generally choose to match these incentives***, even if it results in a negative margin, to compete effectively and grow our business.

113.    The foregoing statements were materially inaccurate, misleading, and/or incomplete because they failed to disclose, *inter alia*, that as of the IPO: (i) Uber was on pace to suffer record losses of ***over $5 billion*** in the quarter of the IPO (and a more than ***doubling*** of the Company's "adjusted EBITDA" loss to -$625 million), due largely to the rapid increase in the amount of the subsidies for customer rides and meals that Uber had offered in a bid to stave off efforts by its competitors (such as

Lyft and GrubHub) to gain market share, which caused the Company's costs of revenue and sales and marketing expenses to balloon; (ii) Uber was experiencing stagnating revenue growth, especially in its core ridesharing business, with the Company on track to have its Core Platform ANR grow just 7% year-over-year in the 2Q2019 compared to the second quarter of 2018 ("2Q2018"); (iii) Uber was retaining less money per trip after paying its Drivers and adjusting for Driver incentives and referrals compared to prior years and quarters; (iv) the number of Uber drivers receiving excess Driver incentives was increasing while the number of Drivers that provided positive revenue for the Company was decreasing; (v) the reduction of Driver incentives would materially and negatively impact Uber's finances and ability to effectively compete against other providers; and (vii) Uber was already planning to cut personnel in key areas, including engineering and sales and marketing, which would undermine Uber's core growth efforts – and that as a result of the foregoing, Uber was largely trapped in a vicious cycle whereby, in order to grow revenue and market share, it had to maintain or increase its payments of expensive "Driver incentives" (to recruit and retain new and existing Drivers), but could not meaningfully grow revenue or market share without experiencing accelerating loss rates and declining margins.  In fact, when Uber reported its financial performance for the quarter in which the Company went public (*i.e.*, 2Q2019), Uber reported that its adjusted revenue growth had slowed to 14%, while revenue from its primary business, ridesharing, had grown only 2%.  Moreover, although the amount Uber customers spent on trips rose 20% on a year-on-year basis compared to 2Q2018, the total amount Uber actually kept after paying its Drivers *decreased* by $100 million.

114.    Uber's accounting methods drew the attention of the SEC.  Specifically, the SEC asked Uber a significant number of questions related to its adjusted revenue and bookings metrics, in addition to general comments about Uber's non-GAAP-compliant approach to revenue recognition.  Uber's response on February 15, 2019, required 16 pages to answer all of the SEC's comments.  Nerissa Brown, an associate professor of accounting at the University of Illinois, was quoted in a July 15, 2019, *MarketWatch* article as saying, "'The driver incentives portion of their revenue model was difficult for SEC staff to grasp, and any typical user would have issues with this as well.'"

115.    Defendants were also required to disclose the foregoing material adverse information in the Offering Documents pursuant to applicable SEC regulations, including Item 303 of SEC Regulation

S-K, 17 C.F.R. §229.303 ("Item 303") (*see infra* §II.D.).   However, rather than comply with these

disclosure obligations, Defendants included generalized and wholly inadequate "Risk Factors" in the

Offering Documents, including, for example, the following "Risk Factors" related to tactics that Uber

employs to remain competitive in certain markets:

> ***To remain competitive in certain markets, we have in the past lowered, and may continue to lower, fares or service fees, and we have in the past offered, and may continue to offer, significant Driver incentives and consumer discounts and promotions, which may adversely affect our financial performance.***

> To remain competitive in certain markets and generate network scale and liquidity, ***we have in the past lowered, and expect in the future to continue to lower, fares or service fees, and we have offered and expect to continue to offer significant Driver incentives and consumer discounts and promotions***. At times, in certain geographic markets, we have offered, and expect to continue to offer, Driver incentives that cause the total amount of the fare that a Driver retains, combined with the Driver incentives a Driver receives from us, to exceed the amount of Gross Bookings we generate for a given Trip. In certain geographic markets and regions, we do not have a leading category position, which ***may*** result in us choosing to further increase the amount of Driver incentives and consumer discounts and promotions that we offer in those geographic markets and regions. We cannot assure you that offering such Driver incentives and consumer discounts and promotions will be successful. Driver incentives, consumer discounts, promotions, and reductions in fares and our service fee have negatively affected, and will continue to negatively affect, our financial performance.

> * * *

> The markets in which we compete have attracted significant investments from a wide range of funding sources, and we anticipate that many of our competitors will continue to be highly capitalized. Moreover, certain of our stockholders, including SoftBank (our largest stockholder), Alphabet, and Didi, have made substantial investments in certain of our competitors and may increase such investments, make new investments in other competitors, or enter into strategic transactions with competitors in the future. These investments or strategic transactions, along with other competitive advantages discussed above, may allow our competitors to compete more effectively against us and continue to lower their prices, offer Driver incentives or consumer discounts and promotions, or otherwise attract Drivers, consumers, restaurants, shippers, and carriers to their platform and away from ours. ***Such competitive pressures may lead us to maintain or lower fares or service fees or maintain or increase our Driver incentives and consumer discounts and promotions***. Ridesharing and other categories in which we compete are nascent, and we cannot guarantee that they will stabilize at a competitive equilibrium that will allow us to achieve profitability.

116.   However, by the time of the IPO, the need for the Company to rapidly increase Driver

incentives and subsidies for customer's rides and meals in a bid to ward off competitors ***had already come***

***to pass***.  In fact, Uber was already spending heavily on increased sales and marketing as of the IPO, which

included costly promotions designed to attract riders and Drivers, with those expenses on pace to swell to

$1.22 billion for 2Q2019, up 71% compared to 2Q2018.  By representing that its sales, marketing, and

promotional costs could go down, specifically as a result of decreased competition and a deescalating price wars with its competitors, Uber was misstating the reality that Uber would likely always have to increase the amount of its already massive expenditures on Driver incentive and Driver referrals to: (i) recruit new Drivers and retain existing Drivers; and (ii) maintain (let alone increase) its market share. Uber was aware of these costs based on the numbers of Drivers that fail to produce positive revenue for the Company.  As one market commentator later observed after Uber reported its dismal results for the 2Q2019, covering the Company's quarterly results observed: "The [Company's] *mounting losses come as Uber continues to . . . offer[] discounts for its core ride-hailing business to attract new customers and compete with companies like Lyft*[,]" underscoring the materiality of these facts.

**C. Misstatements and Omissions Regarding Uber's Regulatory Risks Related to Its Misclassification of Drivers as Independent Contractors**

117.    Uber is subject to differing laws, rules, and regulations in the numerous jurisdictions in which it operates.  The United States, for example, imposes legal restrictions and other requirements on Uber's ridesharing products, including licensing, insurance, and Driver screening.  Outside the United States, certain jurisdictions have adopted similar laws, rules, and regulations.  Complying with and showing deference to each jurisdiction's laws, rules, and regulations is critical to Uber's continued operations in those markets.

118.    This is particularly true for Uber in London, Los Angeles, New York City, San Francisco, and São Paulo, the five cities responsible for nearly a quarter (~24%) of Uber's sales (*i.e.*, "bookings"). According to the Offering Documents, "an economic downturn, increased competition, or regulatory obstacles in any of these key metropolitan areas would adversely affect [Uber's] business, financial condition, and operating results to a much greater degree than would the occurrence of such events in other areas."  To illustrate this point, the Offering Documents provided examples:

In August 2018, New York City approved regulations for the local for-hire market (which includes [Uber's] Ridesharing products), including a cap on the number of new for-hire vehicle licenses for ridesharing services. In addition, in December 2018, New York City approved per-mile and per-minute rates for drivers, designed to target minimum hourly earnings for drivers providing for-hire services in New York City and surrounding areas. These minimum rates took effect in February 2019. We are still working through adjustments to be made with respect to rider promotions, driver supply, and other aspects of our business in response to these regulations; however, these regulations had a negative impact on our financial performance in New York City in the first quarter of 2019 and *may* have a similar adverse impact in the future. Additionally, members of the Board of

Supervisors of San Francisco recently proposed imposing a surcharge on ridesharing trips in San Francisco, and a ballot measure to enact this surcharge may be introduced in 2019.

119.    The Offering Documents also represented that Uber was actively challenging laws and regulations and lobbying to oppose restrictions on its ridesharing business, but limited it to markets where Uber is trying to be "first-to-market" and where it faces "laws and regulations that limit or block [Uber's] ability to offer [its] products to Drivers and consumers in those jurisdictions, thereby impeding overall use of [the Uber] platform."

120.    The Offering Documents also addressed certain Company practices that directly affected its bottom line, including Uber's (mis)classification of Drivers as independent contractors instead of employees.  For example, the Offering Documents stated:

> ***Our business would be adversely affected if Drivers were classified as employees instead of independent contractors.***
>
> The independent contractor status of Drivers is currently being challenged in courts and by government agencies in the United States and abroad. We are involved in numerous legal proceedings globally, including putative class and collective class action lawsuits, demands for arbitration, charges and claims before administrative agencies, and investigations or audits by labor, social security, and tax authorities that claim that Drivers should be treated as our employees (or as workers or quasi-employees where those statuses exist), rather than as independent contractors.
>
> \* \* \*
>
> Changes to foreign, state, and local laws governing the definition or classification of independent contractors, or judicial decisions regarding independent contractor classification, ***could*** require classification of Drivers as employees (or workers or quasi-employees where those statuses exist). ***Examples of recent judicial decisions relating to independent contractor classification include the California Supreme Court's recent decision in Dynamex Operations West, Inc. v. Superior Court, which established a new standard for determining employee or independent contractor status in the context of California wage orders***, the *Aslam, Farrar, Hoy and Mithu v. Uber BV, et al.* ruling by the Employment Appeal Tribunal in the United Kingdom that found that Drivers are workers (rather than self-employed), and a decision by the French Supreme Court that a driver for a third-party meal delivery service was under a "subordinate relationship" of the service, indicating an employment relationship. In *Razak v. Uber Technologies, Inc.*, the Third Circuit Court of Appeals is reviewing misclassification claims by UberBLACK Drivers in Philadelphia following a summary judgment order in our favor at the district court level, and we expect a decision in the near term. ***If, as a result of legislation or judicial decisions, we are required to classify Drivers as employees*** (or as workers or quasi-employees where those statuses exist), ***we would incur significant additional expenses*** for compensating Drivers, potentially including expenses associated with the application of wage and hour laws (including minimum wage, overtime, and meal and rest period requirements), employee benefits, social security contributions, taxes, and penalties. ***Further, any such reclassification would require us to fundamentally change our business model, and consequently have an adverse effect on our business and financial condition***.

38

121.    Failing to classify Drivers correctly also exposes Uber to increased tax liabilities in the form of fees and penalties.  However, the Offering Documents misleadingly downplayed such risks by limiting their "disclosure" of such risks to assessments of unemployment taxes by the state of California:

***State Unemployment Taxes***

In December 2016, following an audit opened in 2014 investigating whether Driver Partners were independent contractors or employees, the Company received a Notification of Assessment from the Employment Development Department, State of California, for payroll tax liabilities. The notice retroactively imposed various payroll tax liabilities on the Company, including unemployment insurance, employment training tax, state disability insurance, and personal income tax. The Company has filed a petition with an administrative law judge of the California Unemployment Insurance Appeals Board appealing the assessment.

122.    The statements in ¶¶118-21 were materially inaccurate, misleading, and/or incomplete because they: (i) failed to adequately describe how the Company's classification and treatment of its Drivers was in violation of and indifferent to current and pending laws, rules, and regulations in multiple key markets, including California – host to two of Uber's top 5 markets based on bookings – where the California Supreme Court had issued a unanimous 2018 ruling in *Dynamex* (requiring companies, like Uber, to classify their Drivers as employees and not as independent contractors) and where a statute to codify *Dynamex* was nearing approval in the California legislature; and (ii) omitted material facts concerning how Uber's business practices and policies subjected it to decreased revenue growth as a result of adverse regulatory actions by other local, state, and overseas jurisdictions, including jurisdictions that threatened to shut Uber out of otherwise lucrative and important markets for its services.  For example, the Offering Documents disregarded the likelihood that Uber would have to reclassify its Drivers as "employees" (rather than independent contractors) and did not disclose the likely costs of such reclassification on its future operations, including costs associated with having to pay overdue unemployment and temporary disability insurance contributions related to the misclassification of its Drivers.  These facts and omissions were material.  In fact, by June 2019, just weeks after the Company went public, Barclays analysts concluded, "***We think an adverse ruling on the contract workforce issue would potentially bankrupt both Uber and Lyft.***"  Moreover, in November 2019, the State of New Jersey's Department of Labor and Workforce Development ("NJ Dep't of LWD") assessed Uber and its subsidiary Rasier LLC ***nearly $650 million*** in unemployment and disability insurance taxes, citing Uber's

misclassification of its Drivers as independent contractors.  The Offering Documents did not adequately disclose the possibility of incurring such enormous fees – omitting entirely any discussion of New Jersey – despite, as was later revealed, the fact that New Jersey had informed Uber *in 2015* that it had obtained a court judgment ordering the Company to pay about $54 million in overdue unemployment and temporary disability insurance contributions for the same reasons.

123.    By the same token, Uber's "Legal and Regulatory Risks," including those that purported to warn about the adverse impact on its business and future prospects that "***could***" occur "***if***" and "***when***" regulatory shifts related to its business model occurred, were likewise inadequate.  For example, the Offering Documents stated:

> Our platform is available in over 700 cities across 63 countries. We are subject to differing, and sometimes conflicting, laws and regulations in the various jurisdictions in which we provide our offerings. A large number of proposals are before various national, regional, and local legislative bodies and regulatory entities, both within the United States and in foreign jurisdictions, regarding issues related to our business model. Certain proposals, ***if*** adopted, ***could*** significantly and materially harm our business, financial condition, and operating results by restricting or limiting how we operate our business, increasing our operating costs, and decreasing our number of platform users. We cannot predict whether or when such proposals may be adopted.

124.    Again, by the time of the IPO, *Dynamex* had already been unanimously decided, and AB5's codification of its holding was on the verge of being enacted in California.  Such generic risk warnings were patently inadequate.

**D.    The Offering Documents Failed to Comply with Applicable SEC Regulations**

125.    In addition, Item 303 imposed an independent duty on Defendants to disclose in the Offering Documents any known events, trends, or uncertainties that Uber, as of the IPO, "reasonably expect[ed] will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  The Offering Documents violated Item 303 by failing to disclose that, as of the IPO: (i) Uber had received thousands of reports from just within the United States of sexual assault, rape, and other abuses by Uber Drivers during the 2017-2018 period; (ii) Uber's customer safety and related investigative and "enforcement" policies and procedures were patently defective and designed to reduce Uber's legal liabilities and exposure to adverse publicity at the expense of customers' interests and safety; (iii) Uber was on pace to experience its largest quarterly loss ever, while rapidly increasing the use of subsidies to prevent its competitors from gaining market share, experiencing stagnating revenue growth

and an accelerating decline in the percentage of the total fees collected per trip, and while also losing drivers on a consistently significant basis, resulting in Uber suffering financial problems and cutting (or planning to cut) costs in key growth-driving areas; and (iv) Uber was facing serious and specific regulatory risks from failing to comply with laws, rules, and regulations in critical markets and was exposed to hundreds of millions in tax liabilities *in just New Jersey* as a result of its misclassification of Drivers as independent contractors.

## III.    THE TRUTH BEGINS TO EMERGE

126.    Unfortunately for investors, the truth concerning the nature and extent of Uber's safety problems, its defective safety policies and procedures, its deteriorating financial performance, and its significant exposure to adverse regulatory actions did not begin to emerge until after the IPO.  Examples of how the truth concerning these matters gradually began to emerge are set forth below.

### A.    The Truth Concerning Uber's Safety Record and Defective Safety Policies and Procedures Begins to Emerge

127.    After the close of the markets, the September 25, 2019, the *WaPo* Article was published on *Washington Post*'s website (which was published in the paper's print edition on the following day), which reported significant new information about how Uber handled customer safety complaints (including allegations of sexual assault and rape) concerning misconduct by Uber Drivers.  The article, titled "When rides go wrong: How Uber's investigations unit works to limit the company's liability," described how Uber, instead of taking immediate disciplinary action against Drivers accused of sexual assault or other serious misconduct, typically gave its Drivers the benefit of a "three-strikes" policy:

> *Uber relies on a three-strikes system that can allow bad actors — both drivers and riders — to keep using the app until three uncorroborated allegations are made,* according to the more than 20 current and former investigators [contacted]. For more egregious claims, *it is generally two such strikes,* they said*.* Without corroborating evidence, such as a police report or rape kit, they said, *they don't have the time, resources or encouragement to delve deeply into most allegations*.

Equally shocking, the *WaPo* Article reported that "[e]ven the strikes system can be superseded by Uber executives who may be motivated to keep as many drivers on the road as possible, investigators said." Indeed:

> In one case, an investigator said he had recommended a driver — who already had two strikes — be permanently deactivated after the driver attempted to rub the leg of a female passenger without her consent. (The driver denied the allegations, according to the

investigator.) ***An Uber executive, noting the driver was a high earner and had completed more than 10,000 rides, allowed him to continue taking fares***, according to the investigator.

Similarly, the *WaPo* Article reported on Uber's over-riding of its "three-strikes system" in another situation, where an Uber investigator described how "a New York-area driver allegedly made three separate sexual advances on riders," but that "[a]fter an [Uber] executive overruled the investigator, ***the driver was allowed to continue working until a fourth incident, when a rider claimed he raped her***."

128.    The *WaPo* Article also described a number of other highly disturbing aspects of Uber's safety policies and practices.  For example, as the *WaPo* Article reported, Uber tasked its 80-member "Special Investigations Unit" with investigating the more serious safety and assault incidents that occur in the course of Uber rides.  However, the *WaPo* Article reported that, although Uber's job postings for positions in its SIU expressed a preference for those with "backgrounds in law enforcement or human resources investigations," "[a]mong those Uber has previously hired for the post are a former fry cook, grocery store cashier and barista[.]"

129.    Even worse, the *WaPo* Article also reported the extent to which Uber's safety and enforcement policies encouraged its investigators to put the Company's interests first, at the expense of transparent reporting, the protection of Uber customers from abusive and predatory Drivers, and passenger safety generally.  For example, as the *Washington Post* reported:

> ***SIU investigators are coached by Uber to act in the company's interest first, ahead of passenger safety,*** according to interviews with more than 20 current and former investigators.
>
> * * *
>
> ***The agents are forbidden by Uber from routing allegations to police or from advising victims to seek legal counsel or [to] make their own police reports, <u>even when they get confessions of felonies,</u>*** said Lilli Flores, a former investigator in Phoenix — a guideline corroborated in interviews with investigators, alleged victims and plaintiffs' attorneys.
>
> * * *
>
> "Investigators are there first to protect Uber; and then next to protect the customer," said Flores, who worked nearly two years for Uber as an investigator and investigations trainer before leaving in November. "Our job is to keep the tone of our conversations with customers and drivers so that Uber is not held liable."
>
> ***<u>Even in the most severe cases</u>, when Uber kicks drivers off the platform, it doesn't convey the information to police, other ride-share companies or background check firms,*** investigators said, steps that could prevent the driver from working for other companies.

42

* * *

*Many investigators said they understood that if they contacted the police or advised victims to do so, they could be reprimanded or even fired.*

130.    The *WaPo* Article, while providing first-hand accounts, data, and descriptions of Uber's previous efforts to settle cases quickly to avoid public scrutiny and adverse publicity, also reported as follows:

> [I]nvestigators say Uber's process leaves bad actors on the road. One investigator recalled the San Francisco driver who purportedly forced his way into the back seat and put his hand up a passenger's blouse before she struggled free. Another heard from riders that their driver threatened them with a hammer hidden under his seat. *Neither lost their driving privileges at the time.*
>
> [Former Uber investigator] Flores said in her time there about one-third of cases handled by investigators dealt with sexual misconduct, including rape or unwanted flirtation or advances.

> * * *

> *But alleged crimes — especially sexual misconduct — happen during ride-hailing trips at an alarming rate, investigators said.* In Chicago alone, more than 300 drivers were banned from Uber, Lyft and rival Via for allegations of sexual misconduct between January 2016 and August 2019, according to data obtained by a Freedom of Information Act request.
>
> More than 1,100 of the nearly 70,000 active registered drivers in the city were barred for matters of safety during that time, according to the data, which showed that drug use or possession and traffic accidents ranked after sexual misconduct as the top reasons for a driver being blocked.

> * * *

> *Even while arguing it shouldn't be held liable for driver or rider conduct, Uber has sought to settle cases quickly to avoid the scrutiny of open court, according to numerous attorneys who have sued the firm.* It's an expensive strategy. Uber, for instance, settled a highly publicized case for roughly $25 million last year involving more than 20 women who alleged various sexual assaults in rides hailed on the app, according to a person familiar with the matter.

> * * *

> In a civil suit against Uber filed last year in Chattanooga, Tenn., that is still ongoing, two female riders allege a driver sexually assaulted them because Uber failed to keep him off the road following the first woman's claim he groped her breast and compelled her to grab his penis. Within 15 days of that alleged incident, he exposed himself to the second woman and tried to grab her, according to the complaint.

131.    The *WaPo* Article also connected the dots between rider safety and Uber's regulatory exposure – connections that were not revealed in the Offering Documents to investors at the time of the

IPO.  As the *WaPo* Article stated: "***Uber's investigative process is broken***, *according to people who have worked there*, *stymied by Uber's insistence that its drivers are independent contractors and not employees — and therefore it isn't responsible for their actions*."  As a result, "Uber has created new risks for riders and drivers that it largely keeps at arm's length — even more so as it is under financial pressure from a bungled IPO" – and despite Uber's claims under CEO Defendant Khosrowshahi that it "'put[s] safety at the heart of everything [it] does[.]'"

132.     The reaction to the findings reported in the *WaPo* Article was swift and fierce.  For example, U.S. Senator Richard Blumenthal ("Senator Blumenthal") (a member of the Senate Commerce, Science and Transportation Committee) promptly assailed Uber for its response to Driver misconduct in a September 25, 2019, letter to Defendant Khosrowshahi that quickly became public (the "Blumenthal Letter").  Senator Blumenthal began the letter by stating that he was "writ[ing] in the wake of deeply disturbing reports about sexual assault and harassment that have occurred through your ride-sharing app and your responses to those incidents."  The Blumenthal Letter then went on to describe the revelations in the *WaPo* Article concerning Uber as "***shocking***" and added that he was "further alarmed by Uber's public statements about this issue, which indicate a brazenly careless attitude about your responsibility to your customers."  As an example, Senator Blumenthal cited a statement by Uber's "global head of women's safety, Tracey Bredeen," who "was quoted as saying, 'At the end of the day, we're not the judge and jury to determine whether a crime has occurred. We're here to gather information, make a business decision.'"  As the Blumenthal Letter stated, such an attitude on Uber's part "is simply ***unacceptable***."

133.     In addition to criticizing Uber for having still not yet produced any "safety transparency reports" that it had previously promised, Senator Blumenthal also blasted Uber for the discrepancies between how Uber marketed its safety benefits as compared to its actual policies and practices.  As the Blumenthal Letter stated:

> Uber has repeatedly marketed itself as a way of ensuring a safe ride home after a night of drinking. If marketing your company as providing safe rides for young, intoxicated women is going to be part of your business model, ***then it is especially crucial that you ensure that these rides are in fact safe.*** Otherwise, these advertisements serve as a signal to sexual predators that driving for Uber is an effective way to prey on vulnerable young women.

134.     The Blumenthal Letter, citing the *WaPo* Article, then continued:

It has also been reported that Uber's policy is to not share findings from complaints of sexual assault with background check firms, competitors or law enforcement. Apparently, the reason for this policy is to allow "a survivor to be able to own their story" and "choose whether they provide that information to police." Yet, news reports indicate that investigators are urged not to advise victims to contact the police at all. ***Putting the onus on a victim of sexual assault to report it to law enforcement, to your competitors and to background checking companies while simultaneously directing your employees not to advise victims to go to the police <u>demonstrates your lack of seriousness</u> about the sexual misconduct that occurs through your app.***

135.    Finding that Uber "must clearly do more to ensure rider safety[,]" the Blumenthal Letter concluded by demanding that Uber promptly provide answers to the following pointed questions:

1.    Please explain Uber's process for dealing with a report of sexual assault or harassment. Do you report the incident to law enforcement? Will you commit to making the details of these procedures available to the public through your app?

2.    What steps do you take to ensure that drivers who assault or harass [Uber] riders are permanently prohibited from driving for Uber? What steps are you taking to ensure that victims are informed of whether the drivers they report for such behaviors still work with your companies?

3.    Will you commit to conducting fingerprint-based, as opposed to name-based, background checks? Will you commit to reporting problematic incidents to background checking companies, law enforcement, and your competitors, such as Lyft?

4.    Do you employ customer service representatives who are trained sexual assault victim advocates? What training do employees receive on identifying sexual harassment and assault? What training do they receive on responding to these reports using a victim-centered approach?

5.    Will you commit to ensuring that reports of sexual assault or harassment are immediately handled by human reviewers specifically empowered and trained to address these issues? Will you publish a detailed account of sexual assault complaints that occur while individuals are using the Uber app, as you have been promising for over a year?

6.    Will you commit to suspending marketing campaigns representing your app as ensuring a "safe ride home" until you publicly release statistics on the number of assaults and incidents of harassment reported against your drivers?

136.    Similarly, the *Washington Post* also reported on September 26, 2019 (the "September 26 *WaPo* Article") that a California lawmaker (Assemblywoman Lorena Gonzalez) would now promptly seek to introduce legislation to hold ride-hailing companies "accountable" and ensure that Uber "properly investigate[s] claims of sexual assault and harassment."  As the September 26 *WaPo* Article reported:

Gonzalez is considering mandatory reporting requirements for allegations of sexual assault after [the *WaPo* Article] found Uber's internal investigators are forbidden to share them with law enforcement or other ride-hailing companies.

45

If a customer reports a crime, Gonzalez told [the *Washington Post*], it must be properly investigated. "There does need to be a responsibility to truly investigate," Gonzalez [said]. "That's clearly not happening."

137. Network news stories also picked up on the *WaPo* Article. For example, on September 26, 2019, the national "CBS This Morning" TV program described the *WaPo* Article as "**explosive**" and aired an interview with a former Uber investigator who commented on how existing policies and practices "really puts people [customers] in a very dangerous position." When asked to comment by a CBS news correspondent about how many cases of assault or sexual abuse Uber experienced in a year, and whether it was "in the tens or [in] the hundreds," however, Uber's global head of women's safety, Tracey Breeden, claimed that she didn't have that information (with the result that investors would not learn until early December that the stunning answer to this question was actually a number in the **thousands**).

138. By market close on September 27, 2019, Uber's stock had fallen to $30.29 per share, from its closing price of $31.68 on September 25, 2019.

139. Then, in an interview reported in the September 26 *WaPo* Article, Uber's Head of Safety Products, Sachin Kansal, noted that "'underreporting'" of sexual assault and other safety problems "'is a big issue in every industry and we want to be able to help with that,'" adding that "'[i]f a user has a bad experience, we want to hear about that.'" Just days later, on September 29, 2019, an Oregon newspaper (*The Register-Guard*) reported that:

> For about a week, a convicted murderer was working as a driver for a ride-hailing company in the Eugene-Springfield area.
>
> In another case, a registered sex offender was behind the wheel.
>
> In all, according to city statistics, about two dozen drivers for Lyft and Uber were allowed to drive passengers in their personal vehicles for a short time after they cleared the companies' third-party background checks **but failed the local check conducted after they were allowed to work**.
>
> It was background checks by the Eugene Police Department that ultimately prompted a city regulator to take the for-hire drivers off the road. Police discovered the offenses while running their own more stringent check and recommended the revocation of the drivers' city-issued license.
>
> [T]he number illustrates the potential public safety risk in the compromise that city leaders made to bring ride-hailing back into the market. And it raises questions as Uber and Lyft continue to push for statewide regulations that would pre-empt local background checks.

* * *

46

The city provided the following information about ride-sharing drivers using conditional licenses who failed the local EPD background check from September through late spring:

- Five for public safety concerns, including one registered sex offender and a convicted murderer

- 10 for misdemeanor arrests within three years

- Three for felony arrests within seven years

- Three for felony arrests within 10 years

- Four for having currently open court cases, including one open felony case

140. With Uber's safety practices under scrutiny, it was also reported on September 30, 2019, that an Uber Driver had sexually assaulted a "helpless" female passenger in North Carolina on June 27, 2019. The Driver was charged with second degree kidnapping and a second degree forcible sex offense.

141. Partly in response to news reports on September 26 and 27, 2019, regarding Uber's plan to roll out certain new safety features to protect its customers (such as the ability to dial "911" directly from the Uber app), on October 1, 2019, Senator Blumenthal took to Twitter to describe these initial steps as "a meager start" towards addressing such serious problems. As Senator Blumenthal stated, "[Uber and Lyft] do nothing to address the fundamental problems of ensuring drivers pass rigorous background checks & preventing predatory drivers from jumping from one app to another[,]" while adding: "Drivers with credible allegations of sexual assault should be kicked off the app & when companies get complaints, law enforcement must be notified immediately. Uber & Lyft should not be telling employees to dissuade victims from notifying the authorities—*this is unacceptable*."

142. On October 1, 2019, Uber's stock fell below $30.00 to close at $29.15, within just a week of the publication of the *WaPo* Article.

143. During October 2019, it was also widely reported that Uber (and Lyft) executives would refuse to appear before the U.S. House of Representatives' Transportation and Infrastructure Committee in connection with that Committee's inquiry into safety, laborm and congestion. This decision angered

lawmakers, who concluded that Uber's (and Lyft's) failure to appear "is a telling sign that they would rather suffer a public lashing than answer questions on the record about their operations."[3]

144.    On November 25, 2019, Transport for London ("TFL") announced that Uber would not be granted a new license to operate in London – one of Uber's top five markets globally – due, in part, to "*repeated safety failures*."  According to TFL, the Company was not "'fit and proper'" for a license.

145.    Following TFL's decision not to renew Uber's license, published reports noted that the TFL had "identified 'a pattern of failures'" in London "that placed passengers' safety at risk[,]" including "a change in Uber's system that 'allowed unauthorised drivers to upload their photos to other Uber driver accounts[,]'" with the TFL identifying at least 14,000 such unauthorized trips in London in 2018 and early 2019.[4]  It was similarly reported by *BBC News* that the TFL "found dismissed or suspended drivers had been able to create Uber accounts and carry passengers. In one example, a driver was able to continue working for Uber, despite the fact his private hire licence had been revoked after he was cautioned for distributing indecent images of children."[5]  It was later revealed, for example, in a January 24, 2020, article published by *Insurance Journal*, titled "Uber in London Failed to Flag Assault Complaints, Monitor Drivers' Insurance Status," that Uber had actually received a 62-page document from TFL explaining its decision, which cited TFL's finding that the Company failed to "promptly notify [TFL] about *seven* incidents that led [Uber] to suspend a driver[,]" which included cases involving "allegations of *rape* and *sexual assault*[.]"

146.    Uber's stock closed to $29.11 on November 25, 2019.

147.    However, still more shocking information about the nature and extent of Uber's safety record was yet to come.  In particular, after the market closed on December 5, 2019, Uber finally published

---

[3]      *See* Press Release, House Comm. on Transp. & Infrastructure, Chairs DeFazio, Norton Statements from Hearing on Future of Transportation Network Companies (Oct. 16, 2019), https://transportation.house.gov/news/press-releases/chairs-defazio-norton-statements-from-hearing-on-future-of-transportation-network-companies.

[4]      *See* Tom Warren, *Uber loses its London license as regulator cites a 'pattern of failures'*, THE VERGE (Nov. 25, 2019), https://www.theverge.com/2019/11/25/20981492/uber-london-ban-license-renewal-transport-for-london-tfl-response.

[5]      *See Uber loses licence to operate in London*, *supra* n.3.

its 84-page "US Safety Report" for the two-year period covering 2017 and 2018 (and which therefore covered incidents that occurred in the two-year period leading up to the IPO) (the "Safety Report").

148.   The Safety Report stated that, based on "the 5 *most serious* categories in the Sexual Misconduct and Sexual Violence Taxonomy," there had been *almost 6,000* reports of serious sexual assault during the 2017-2018 period, including 3,045 in 2018 and 2,936 in 2017.  In other words, *eight users a day* alleged that they were attacked while riding in an Uber.  More specifically, the Safety Report stated that during this two-year period there had been:

(a)   1,164 reports of "non-consensual kissing of a non-sexual body part";

(b)   587 reports of "attempted non-consensual sexual penetration";

(c)   3,000 reports of "non-consensual touching of a sexual body part";

(d)   766 reports of "non-consensual kissing of a sexual body part" (46% of which involved non-consensual touching of "the genitals or genital area"); and

(e)   464 reports of "non-consensual sexual penetration."

A minority of these reported cases involved attacks on Drivers.  However, the only category where Uber specifically broke down safety episodes by victim was the "Non-Consensual Sexual Penetration" category, where the Safety Report conceded that a *customer* was the victim in roughly *92%* of the reported cases (or 429 cases).  Data in the remaining sexual assault categories was broken down to reflect whether they were reported by customers, Drivers, or third parties.  The "reporting party" in instances of "Non-Consensual Kissing of a Sexual Body Part" was the *customer* roughly *75%* of the time (or 576 cases). The "reporting party" in instances of "Attempted Non-Consensual Sexual Penetration" was the *customer* roughly *72%* of the time (or 423 cases).  The "reporting party" in instances of "Non-Consensual Kissing of a Non-Sexual Body Part" was the *customer* roughly *46%* of the time (or 535 cases).  And the "reporting party" in instances of "Non-Consensual Touching of a Sexual Body Part" was the *customer* roughly *50%* of the time (or roughly 1,470 cases).

149.   As if these numbers were not shocking enough, the Safety Report also conceded that sexual assaults are "one of the most . . . under-reported crimes in modern society" and noted that "releasing this type of [safety] report may actually lead to an increase in the number of reports in the future" because

"when it becomes clear that Uber is paying close attention to reports of sexual violence and taking action, survivors may feel more comfortable coming forward."

150.    In addition, although the Safety Report did not provide any actual numbers from 2019, it indicated that during the January to June 2019 period (which included the months falling immediately before and after the IPO), Uber was on track to experience roughly another 2,500 serious sexual assaults in 2019.[6]

151.    Publication of the Safety Report generated a firestorm of negative publicity and outrage. For example, a December 6, 2019, *Washington Post* article, titled "On Uber, hundreds of rape allegations go unreported to police," noted that the shocking raw numbers were only part of the story:

> Buried inside Uber's inaugural safety report this week that detailed thousands of sexual assaults and more than 100 deaths was ***another staggering revelation: hundreds of rape allegations have gone undisclosed to law enforcement.***
>
> * * *
>
> That suggests police weren't aware of nearly 300 rape allegations, potential felonies. Uber didn't disclose the involvement of law enforcement in the 6,000 reports of sexual assault. That means police are potentially unaware of thousands more cases of sexual assaults.
>
> * * *
>
> ***The finding that Uber knows vastly more than police about the scale of rape and sexual assault during its rides is raising alarms among law enforcement, regulators and victims advocates who say the company keeps valuable information to itself — and struggles to take responsibility for what happens on its platform.***
>
> "***These numbers represent a staggering systemic failure,***" said Sen. Richard Blumenthal (D-Conn.), a frequent critic of ride-hailing services who accuses them of dodging responsibility for safety concerns.
>
> * * *
>
> ***Former San Francisco district Attorney [G]eorge Gascón . . . said the company's revelation raises serious issues with the platform and its aggressive expansion***.
>
> "I think it's extremely troubling that we're finding out now that only a third of [offenses] have been reported because what we know also is that people who engage in sexual assault and receive no consequences tend to re-offend[.]"
>
> * * *

---

[6]    *2017-2018: US Safety Report* at 70, UBER TECHS., INC. (Dec. 5, 2019), https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf.

Victims rights groups and other experts said the thousands of reports of sexual assault could represent just a fraction of the incidents during ride-hailing trips.

* * *

"Nothing that they have done is defensible regarding not reporting these incidents to police," [Mike Bomberger, an attorney with Estey & Bomberger] said. "*Look at the consequences of not reporting: What's the message you send to your drivers if you know a crime's been committed in the car, you're aware of it and it's not been reported to police? Number two: You know that a particular driver has committed a crime, is a sexual predator, and now you're going to let that sexual predator back into the public to do whatever sexual predators do. You look at the pros and cons, and there's no way you can defend not reporting that to police.*"

* * *

Some of the reporting issues stem from *systemic issues* at Uber's Special Investigations Unit, a call center in Phoenix that is charged with handling the most sensitive reports from passengers and drivers. The Post revealed in September that workers in that unit were charged with serving the company's interest first, seeking to avoid liability for safety issues, guided by a policy that prohibited reporting to police.

152.    After the Safety Report was released, even major presidential candidates took notice and slammed Uber for what they said was its role in creating a climate of sexual assault.  For example, Senator Elizabeth Warren tweeted to her millions of followers, "*Uber's safety investigators are reportedly more concerned about protecting their company from liability than protecting passengers and drivers*."

153.    News of the Safety Report was also widely carried on the internet.   For example, a December 6, 2019, *WIRED.com* article, titled "A Criminologist Says Uber's Crime Report Is 'Highly Alarming'," reported as follows:

More than 3,000 people reported sexual assaults related to Uber rides in the US last year, the ride-hail company said Thursday in a long-awaited report on violence and safety—an average of eight per day.

* * *

The data is difficult to put in context.

* * *

Still, one criminologist said that, unlike [Uber's CLO] West, he was surprised by the numbers contained in the Uber safety report, and not in a good way. "*It's highly alarming*," says John Roman, a senior fellow at NORC at the University of Chicago, a social science research organization.

Data on violence, and particularly sexual violence, is fraught, as victims historically have been loath to involve law enforcement. Uber noted in its report that police were involved in just 37 percent of the rape incidents reported through its app; that likely makes Uber's reported numbers look artificially high when compared with national crime statistics. Plus,

51

the FBI's data on sexual assault has been bedeviled by issues of classification. In fact, Uber worked with advocacy groups to create a "taxonomy" of sexual assault—five categories ranging from nonconsensual kissing of a nonsexual body part to nonconsensual penetration—for the report. Still, "stranger rape" is relatively rare: Just 27,000 incidents occurred last year, according to the Rape, Abuse & Incest National Network, fewer than 20 percent of the total rape incidents reported to the FBI.

Uber, meanwhile, reported 235 rapes last year, about one in every 5 million trips. To Roman, that seems very high, especially given that most of these incidents are between strangers who interact fleetingly during an Uber ride. That goes for "stranger" homicides too—just about 450 arguments between strangers led to murders in the US last year. According to Uber data, 19 of those were related to the company's rides.

"***We all think being victimized by a stranger is just the price of just living in America,*** *says Roman. "But I think people don't understand how rare stranger homicides and stranger rapes are. To see all these [Uber-related] rapes and murders—that's the thing that makes me really alarmed here.*"

\* \* \*

Uber cautions against comparing the rate of incidents on rides with national data because its riders tend to be more urban and more affluent than other Americans.

**But Roman surmises that Uber's model contributes to crimes. For one, unlike taxi drivers, Uber drivers use their own vehicles, which typically don't include your classic plexiglass divider.** A study in the Baltimore area in the mid-1990s suggests that assaults on taxi drivers dropped precipitously after the city required taxi owners to put partitions into all their vehicles. The intimate quarters of an Uber car ride might invite inappropriate behavior—and a partition might prevent it.

The violence may also be related to Uber's controversial employment model, which classifies drivers as independent contractors rather than full-time employees. "There's a big literature in criminology that finds people are less likely to commit crimes if they fear losing their job because of it," says Roman. But if drivers only view their job as an occasional, part-time gig—not a job—Roman says they're less likely to approach driving with professionalism, or with fear of termination.

154.    After the markets closed on December 6, 2019, *Mercury News* published an article titled "Uber Loses $1.4 Billion In Value After Reporting Thousands Of Sexual Assaults In Its Rides."  The article quoted Dan Ives, a Wedbush analyst who follows Uber, as stating: "The safety report paints another black eye for Uber as the company continues [to] have business model issues which need to be addressed."

155.    Similarly, the online edition of the financial publication *Barron's* published an article after the markets closed on December 6, 2019, titled "If Uber Thought Its Safety Report Would Help its Reputation, Wall Street Didn't Buy It."  As the *Barron's* article reported: "[T]hough the company tried its best to frame the figures within the context of national averages, the headline numbers, especially for

52

sexual assaults, didn't help. . . . '"***It's a disaster*** and another major black eye for Uber with safety issues front and center,' Wedbush analyst Dan Ives told *Barron's*."

156.    In the wake of Uber's release of its Safety Report and resulting commentary, Uber's stock closed at $27.86 on December 6, 2019.

**B.    The Truth About the Company's Financial Condition and Performance, Including the Magnitude of the Obstacles to Profitability, Begins to Emerge**

157.    On July 29, 2019, the Company announced that it had cut ***one-third*** of its marketing staff (or about 400 employees worldwide).

158.    Market analysts reacted negatively.   For example, CNBC reported that Uber shares dropped 1% on the adverse news.  Similarly, on August 7, 2019, *Forbes* published an article commenting on this announcement, stating that such a large cut in a company's marketing staff is "not usually a sign of things going swimmingly[.]"

159.    After the close of the market on August 8, 2019, Uber reported its financial results for the 2Q2019 – a quarter that was already roughly 44% over as of the date of Uber's IPO.  In its earnings press release, Uber reported, *inter alia*, a record ***$5.2 billion loss*** for 2Q2019 and a record low level of quarter-on-quarter revenue growth.  Even excluding the $3.9 billion that it attributed to one-time stock-based compensation expenses related to its IPO and $297 million in purportedly one-time payments it made to its Drivers, the remaining approximately ***$1.3 billion loss*** was still significantly larger than Uber's $878 million loss for the same quarter the previous year.  Further, Uber revealed that its ridesharing revenue growth slumped to only 2% and, significantly, that its sales and marketing expenses for the three and six months ended June 30, 2019, ***increased by $507 million, or 70.9%, and $870 million, or 62.5%, respectively***.  Defendants acknowledged that "the increase in [Uber's] sales and marketing expenses were driven by ***increased Driver incentives and consumer discounts, promotions, refunds and credits*** as we invest in our platform."   Indeed, consumer discounts, promotions, refunds, and credits increased from $226 and $459 million for the three and six months ended June 30, 2018, respectively, to $528 million and $1.1 billion for the three and six months ended June 30, 2019, respectively, compared to $302 and $621 million in the same periods in 2018.  Moreover, although the amount that Uber's customers spent

on trips increased by 20% on a year-on-year basis, the total amount Uber actually kept after paying its Drivers *decreased* by $100 million.[7]

160.    Commenting on these results, an August 8, 2019, *TechCrunch* report, titled "Uber lost more than $5B last quarter," observed:

> $5.2 billion in net losses represents the company's largest-ever quarterly loss. ***Revenue, for its part, is up only 14% year-over-year, igniting concerns over slower-than-ever growth***. The company says a majority of 2Q losses are a result of stock-based compensation expenses for employees following its May IPO. ***Stock compensation aside, Uber still lost $1.3 billion, up 30% from Q1.***
>
> ***Analysts had expected losses per share of $3.12 versus Uber's $4.72***. As for revenue, analysts, per CNBC, had expected $3.36 billion, or an additional $200 million.

And an August 9, 2019, article posted on *The Economist*'s website stated: "[E]ven the company's preferred measure of profits, 'adjusted-EBITDA' showed a loss of $656m, better than the first quarter of the year but worse than the same period a year earlier. And the rapid growth that the losses are intended to sustain seems to be faltering."

161.    Similarly, an August 8, 2019, *Reuters* article, titled "Uber Loses $5 billion, Misses Wall Street Targets Despite Easing Price War," stated:

> ***[Uber] reported a record $5.2 billion loss and revenue that fell short of Wall Street targets on Thursday as growth in its core ride-hailing business slowed, sending its shares down 6%.***
>
> The company said a price war in the United States was easing and that an important measure of profitability topped its target, ***but slowing revenue growth raised questions about Uber's ability to expand and fend off competition***.
>
> "Losses are widening and the competition is cut-throat," said Haris Anwar, analyst at financial markets platform Investing.com. "***What's sapping investor confidence and hitting its stock hard after this report is the absence of a clear path to grow revenue and cut costs.***"
>
> * * *
>
> ***Uber reported that revenue growth slowed to 14% to $3.2 billion and fell short of the average analyst estimate of $3.36 billion,*** according to IBES data from Refinitiv. ***The company's core business, ride-hailing, grew revenue only 2% to $2.3 billion.***

The same article also noted that Uber was keeping "less money per car ride" in the quarter.

---

[7]    In other words, the amount that Uber kept *decreased* from $525 million in 2Q2018 (Core Platform Adjusted Net Revenue of $2.5 billion multiplied by "Take Rate" of 21%) to only $425 million in the 2Q2019 (Core Platform Adjusted Net Revenue of $2.7 billion multiplied by "Take Rate" of 17%).

162.     Other market commentators also expressed serious concerns over Uber's reported results. For example, as Alyssa Altman, transportation lead at the digital consultancy firm Publicis Sapient commented: "'***To say that earnings were disappointing would be an understatement, Uber has turned into the magical money burning machine.***'"  Michael Hewson of *CMC Markets* likewise commented: "[Despite] low expectations, Uber's Q2 numbers still managed to disappoint on pretty much every level[.]"  Finally, an August 9, 2019, *CNN Business* article, titled "Uber Burned Through $5.2 Billion Last Quarter, Its Biggest Quarterly Loss Ever," stated:

> ***Even by Uber's standards, the company burned through a staggering amount of money in its most recent quarter.***
>
> Uber . . . said Thursday that it lost $5.2 billion in the three months ending in June, its largest quarterly loss ever, fueled mostly by $3.9 billion in stock-based compensation expenses related to its public offering during the quarter.
>
> ***Without those charges, however, the company still lost about $1.3 billion during the quarter, a roughly 50% spike from the year prior.*** The mounting losses come as Uber continues to invest in freight shipping, meal deliveries and offering discounts for its core ride-hailing business to attract new customers and compete with companies like Lyft[.]
>
> *    *    *
>
> ***But even as it invests aggressively, Uber's revenue growth continues to slow***. The company posted revenue of $3.1 billion during the quarter, a 14% increase from the year prior — hardly the rocket ship growth that investors typically expect from newly public technology firms.
>
> ***Uber's core ride-hailing business was all but flat. Revenue in this sector ticked up just 2% from the same quarter a year ago.***
>
> *    *    *
>
> Shares of Uber fell by as much as 12% in after hours trading Thursday following the disappointing earnings report, before rebounding somewhat.

163.     In the wake of the Company's earnings release and related commentary, Uber's stock price fell sharply.  For example, on August 9, 2019, it fell $2.92 per share to close at $40.05, on heavy trading of over 35 million shares.

164.     Moreover, over the next few trading days, the price of Uber shares continued to fall as the market continued to digest the seriousness of Uber's 2Q2019 earnings results and its further announcement, after the close of the market on August 9, 2019, that the Company had implemented a hiring freeze for new software engineers and product managers.

165.    On August 12, 2019, the price of Uber shares closed at $37.00 per share on further heavy trading of over 20 million shares.

166.    Uber stock continued to fall as Uber continued to be the subject of further negative commentary.  For example, on August 13, 2019, a *MarketWatch* article, titled "Uber closes at record low as losses, hiring freeze continue to weight on stock," stated: "Profitability remains a key question for the ride-hailing giants [Uber and Lyft], especially in the wake of Uber's big second-quarter loss."  By the market close on August 14, Uber's stock had fallen to only $33.96 per share.

167.    Over the remainder of the month of August 2019, Uber's stock continued to trade low.  An article titled "Why Uber Stock Crashed 23% in August," published by the *Motley Fool* investment website on September 11, 2019, summed up Uber's month as follows:

Shares of Uber Technologies (NYSE: UBER) were moving in reverse last month after the ridesharing pioneer reported another underwhelming quarter, featuring slowing revenue growth and wide losses. As a result, the stock fell 23% during August, according to data from S&P Global Market Intelligence.

. . . [M]ost of the stock's losses for the month came during the second week of August after its second-quarter earnings report came out.

* * *

***[Uber's] revenue in the quarter rose just 14% to $3.17 billion, badly missing estimates at $3.36 billion***, though gross booking grew faster, increasing by 31%, or 37% in constant currency, to $15.8 billion. Revenue, adjusted for currency and a one-time driver award associated with the IPO, was up 26%.

***More concerning may have been that the company's adjusted EBITDA[8] loss more than doubled in the period, increasing 125% to $625 million, a sign that profitability is only getting further away for the ride-hailing juggernaut.*** That translated into a ***per-share loss of $4.72 versus analyst expectations of a $3.12 loss***.

The stock continued to decline following the report as news emerged that Uber had instituted a hiring freeze, a warning sign for a growth stock.

* * *

---

[8]    Uber's Prospectus (at 30) defines "Adjusted EBITDA" as "net income (loss), *excluding*: (i) income (loss) from discontinued operations, net of income taxes, (ii) net income (loss) attributable to redeemable non-controlling interest, net of tax; (iii) benefit from (provision for) income taxes; (iv) income (loss) from equity method investment, net of tax; (v) interest expense; (vi) other income (expense), net, (vii) depreciation and amortization; (viii) stock-based compensation expense, (ix) legal, tax and regulatory reserves and settlements; (x) asset impairment/loss on sale of assets, (xi) acquisition and financing related expenses, and (xii) restructuring charges."

*At this point, Uber looks like a broken IPO*. Growth is sharply decelerating, and it's still losing billions of dollars a year. The company has plenty of ideas and several secondary businesses in addition to its core ridesharing operation, but that doesn't really matter if the numbers don't add up. If top-line growth continues to slow, look for the stock to fall even lower.

168.   On September 10, 2019, Uber announced that it was *laying off another 8% of its workforce* (principally 435 employees within its product and engineering divisions), on top of the worldwide marketing staff cuts and North American hiring freeze for software engineers and product managers that had been announced in August.  In October, Uber cut an additional 350 jobs – its third round of job cuts in just three months.

169.   After the close of trading on November 4, 2019, Uber reported its financial results for the third quarter of 2019 ("3Q2019").  Among other things, Uber reported another massive quarterly loss of $1.16 billion, or $759 million exclusive of certain additional one-time stock-based compensation expenses related to the IPO.  It also reported that the Gross Bookings of Uber rides, restaurant meal deliveries, and other transactions only increased 29% as compared to the third quarter of 2018 a year earlier – which market analysts observed amounted to "*the slowest rate of increase* since Uber began reporting that figure."

170.   In the wake of Uber's announcement of its 3Q2019 financial results and related analyst commentary, Uber's stock fell on November 5, 2019, to $28.02 per share on heavy volume of over 52 million shares traded – and fell further the following day, on even heavier trading volume of over 133 million shares, to close at only $26.94 on November 6.

**C.   The Truth About Uber's Active Efforts to Evade Laws, Rules, and Regulations by Misclassifying Drivers as Independent Contractors and Uber's Exposure to Other Adverse Regulatory Actions Begins to Emerge**

171.   On May 17, 2019, *Bloomberg* published an article linking Uber's struggling share price to "the weight of questions about the viability of its business model," citing, in particular, "*whether drivers will be compensated as employees or remain independent contractors as Uber treats them now*." *Bloomberg* noted a recent California appeals court decision, ordering Uber to turn data over to the City of San Francisco as part of its probe into whether "Uber is underpaying its drivers *in violation* of the city's minimum wage laws."  Following this news, Uber's share price fell $1.09 from the previous day's closing share price.

172.    On May 29, 2019, the California State Assembly passed AB5, legislation that would codify the California Supreme Court's 2018 decision in *Dynamex* and its "ABC test" for determining whether a person should be classified as a company's employee or as an independent contractor.

173.    On June 12, 2019, the *San Francisco Chronicle* published an Op-Ed from Defendant Khosrowshahi and two senior Lyft executives in which they lobbied against AB5 and urged California authorities to agree to regulatory proposals that would keep their companies' drivers from being treated as "employees."

174.    Market analysts covered this collaborative campaign, noting the "existential threat" the AB5 had on Uber's business model.  For example, on June 12, 2019, *Bloomberg* reported that:

> The [Uber and Lyft] executives' public appeal follows ***months of private efforts*** by the ride-share giants and other companies to secure support from California's governor, state lawmakers, and labor leaders for some deal to shield them from ***a sweeping 2018 state supreme court ruling*** that makes it difficult for firms to claim their workers aren't employees.
>
> Whether Uber and Lyft drivers remain independent contractors or must be treated like employees goes to the heart of the on-demand economy's reliance on a casual labor force to keep costs down. ***For both companies, which just went public, the prospect of being compelled in their home state to completely overhaul how drivers are compensated <u>is an existential threat</u>.***
>
> Under the April 2018 ruling known as Dynamex, workers are employees entitled to state wage-law protections unless they are conducting "work that it outside the usual course" of the company's business. For companies whose core service is transporting customers via an army of drivers they claim are all contractors, that could be a challenging test to pass.

175.    In an article published on June 14, 2019, by *Business Insider*, it was noted that executives at Uber "***severely understate[d] the case***. Uber . . . can't afford significantly higher labor costs, if [it] want[s] to satisfy investors[,] [since] [m]ore growth means more drivers, and that equation doesn't add up to future profits that would vindicate Uber['s] . . . market cap[.]"  Following this news, and as investors gradually began to appreciate the extent to which the Offering Documents had "severely understated" the nature and extent of the "existential" threat posed by having to reclassify its drivers as employees, Uber's stock fell, closing June 14, 2019 at $43.23 per share.

176.    On Friday, June 21, 2019, Judge Edward Chen of the U.S. District Court for the Northern District of California declined to dismiss certain claims brought against Uber by Los Angeles-based transportation service Diva Limousine ("Diva") and held that Uber's alleged misclassification of Drivers

as independent contractors could significantly harm competition and violate the spirit of antitrust laws.  In an article published on the same day covering this decision, *Bloomberg Law* reported that "[t]he ruling was based in part from language drawn from the California Supreme Court's April 2018 ruling in *Dynamex* [which] . . . made it harder for California employers to classify workers as independent contractors rather than employees."  Significantly, as the June 21 *Bloomberg Law* article also noted, Uber had only "***identified <u>Dynamex</u> in regulatory filings as a <u>long-term</u> potential risk factor for its business success.***"  On June 24, 2019, the next trading day, Uber's stock closed at $43.09.On July 8, 2019, David Weil ("Weil") (the former U.S. Department of Labor Wage and Hour administrator under President Barrack Obama) published an Op-Ed in the *Los Angeles Times* averring that Uber and Lyft drivers should be classified as what they actually were – "employees."  Weil noted that Uber's status as "employer" of its Drivers is "really quite clear" and warned:

> ***Uber . . . cannot survive*** if [it] no longer can treat [its] drivers as independent contractors. Such a change would mean that [it] would have to factor in the real costs of drivers into [its] business model. [It] would have to figure out how to comply with workplace laws like the minimum wage, provide certain baseline protections like unemployment insurance and workers compensation, and collect and pay state and federal payroll taxes. In other words, [Uber] would have to do what millions of other businesses do every day.

177.    On July 8, 2019, Uber's stock fell $0.59 per share (or 1.33%) to close at $42.95.

178.    In the following weeks, market analysts also increasingly warned of the likely impact of the enactment of AB5 on Uber were it adopted nationally, given California's historic leadership in "progressive movements that ultimately sweep nationwide."  For example, as a July 17, 2019, *InvestorPlace.com* article, titled "California AB-5 Vote is Bad News for Uber and Lyft Stock," stated, the damage to Uber flowing from AB5 would likely not "be contained in California."

179.    On August 14, 2019, a $32.5 million settlement to resolve class allegations against Uber for charging riders misleading fees received final approval by the U.S. District Court for the Northern District of California.  According to media reports covering the settlement, the settlement required Uber to: (i) stop charging "Safe Ride Fees," which it had allegedly failed to properly disclose to customers prior to their rides (and allegedly used to pay for certain efforts to provide safe rides); and (ii) stop using statements like "safest ride on the road" and "industry-leading" in advertisements.  Uber's stock closed on August 14 at $33.96 per share, or 6.83% below its previous day closing price of $36.45 per share.

180.    Then, on August 29 and 30, 2019, it was widely reported that Uber had committed at least $30 million to lobby and support a ballot measure in California that, if approved, would allow Uber to avoid having to comply with *Dynamex* or AB5.  In addition to committing this sum, Uber had also reportedly hired consultants, conducted research and polling, and drafted language for such a ballot measure, under which Uber Drivers would be classified as non-employees.  In the wake of this news, which further signaled to markets just how dangerous *Dynamex* and AB5 were to Uber, on September 3, 2019, the next trading day, Uber's stock closed at $30.70 per share.

181.    On September 11, 2019, the California Senate passed AB5.  Commentators were again swift to react.  For example, Katie Wells ("Wells"), a fellow at Georgetown University who specializes in the social and economic effects of on-demand services, explained, "***This is such a cut to the heart of their business practice***[,]'" adding that "'[t]he fact that [Uber is] suggesting that there is a solution to be had **acknowledges that there is a problem**.'"  As Wells concluded, "**it is a watershed moment.**"

182.    Other market analysts echoed Wells's views, especially those that had already calculated the financial implications of AB5 for Uber in California.  For example, a September 11, 2019, analyst report from Barclays Plc and Macquarie Capital stated that "[g]iving employee status and benefits to workers in California would cost Uber . . . ***an additional $2,000 to $3,600 per driver annually***," which "would be as much as ***$500 million for Uber in the state [per] year***."  Moreover, on the same day, *Fortune* published an article that reported: "California often sets the legislative tone for other states to emulate, [so] the costs could quickly add up if more follow suit."

183.    Others, such as *Bloomberg News*, further noted that Uber was "facing the most serious threat yet to its business model" and quoted individuals knowledgeable about the regulation as stating that AB5 was a "groundbreaking shift" that "***threatens to upend*** [Uber's] source of cheap labor" and warned that Uber was "***whistling past the graveyard***" by underestimating how much AB5 favors drivers.

184.    On September 18, 2019, California Governor Gavin Newsom signed AB5 into law.

185.    Uber's regulatory woes continued.  On September 24, 2019, London's TFL announced that it would only grant Uber London Ltd. a two-month private hire operator license in advance of its consideration of any potential further licensing application.  "The new two-month licence will have the same conditions that Uber has been subject to over the last 15 months, along with new conditions to ensure

1   passenger safety." In the wake of this news, Uber's stock fell $1.70 per share (or more than 5%), to close

2   at $31.30 per share on September 24, 2019.

3          186.   On October 17, 2019, it was reported that "New Jersey labor auditors [were] investigating

4   Uber" to see if it is "***wrongly classifying drivers*** as independent contractors" and, if so, whether Uber

5   "should be responsible for ***employment taxes***[.]" *Bloomberg Law* noted that the NJ Dep't of LWD had

6   sent surveys to drivers across the state over the last year seeking information about their work

7   arrangements and tax status, that the "investigation is the latest challenge to the Uber and Lyft business

8   model," that the "probe comes as the companies face a number of lawsuits over their classification of

9   drivers as contractors[,] . . . includ[ing] recent proposed class actions in federal courts in New Jersey and

10  Massachusetts[,]" and that the "companies' costs per driver could jump by more than 20% if they have to

11  reclassify workers as employees[.]" On October 18, 2019, the Company's stock closed at $32.06. By

12  October 21, 2019, Uber's stock had fallen further, down to $31.41 per share.

13         187.   Just over a week later, on October 29, 2019, Uber unveiled a proposed ballot measure to

14  fight California's codification of *Dynamex*. The ballot measure, which sought to exempt Uber from the

15  state legislation, was characterized by the California Labor Federation as being yet '"another brazen

16  attempt by some of the richest corporations in California to avoid playing by the same rules as all other

17  law-abiding companies.'" Market analysts continued their coverage of this development on October 30,

18  2019.[9] On October 31, 2019, Uber's stock dropped 6.67% to $31.50 per share.

19         188.   Then, on November 14, 2019, the NJ Dep't of LWD assessed Uber ***$523 million*** in past-

20  due taxes covering the prior four years, together with as much as ***$119 million in interest and penalties***,

21  in connection with its misclassification of its drivers as independent contractors. At the same time,

22  *Bloomberg Law* revealed to the market that "New Jersey [had] informed ***Uber in 2015*** that it had obtained

23  a court judgment ordering the company to pay about $54 million in overdue unemployment and temporary

24  disability insurance contributions." Following this news, Uber shares fell to $25.99.

25

26

27  [9]   *See*, *e.g.*, Graham Rapier, *California's Assembly Bill 5 Could Drastically Reshape the State's Gig
    *Economy. Uber and Lyft Have an Alternative Proposal*, INC.COM (Oct. 30, 2019), https://www.inc.com/

28  business-insider/california-gig-economy-bill-uber-lyft-alternative-proposal.html.

189.    As detailed *supra* in ¶144, ten days later, on November 25, 2019, the TFL announced that Uber would not be granted a new license to operate in London, having characterized Uber as being neither "fit" nor "proper."  Uber's stock fell to $29.11 on this news.

190.    As the truth concerning the nature and extent of these and related material adverse problems were gradually revealed, the price of Uber's Class A common stock plummeted from the IPO Price of $45.00 per share to close on November 25, 2019 at $29.11.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

191.    Plaintiffs bring this class action on behalf of a class consisting of all persons or entities that purchased Uber's Class A common stock pursuant or traceable to the Offering Documents for Uber's May 2019 IPO and who were damaged thereby (the "Class").  Excluded from the Class are Defendants; the past and current officers and directors of Uber and the Underwriter Defendants; the legal representatives, parents, subsidiaries, heirs, immediate family members, successors, and assigns of any such excluded person or entity; and any entity in which any of the above excluded persons or entities has or had a controlling interest (but in the case of the Underwriter Defendants, only such entities that they have or had a majority ownership interest in).  Also excluded from the Class are any of Uber's employee retirement and/or benefit plan(s), and their participants or beneficiaries in their capacities as such, to the extent they made purchases through such plan(s).

192.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be determined through appropriate discovery, Plaintiffs believe that there are thousands if not tens of thousands of members of the proposed Class.  The members of the proposed Class may be identified from records maintained by the Company, its transfer agent, and/or the Underwriter Defendants and may be notified of the pendency of this action by mail using customary forms of notice that are commonly used in securities class actions of this type.

193.    Each Plaintiff's claim is typical of the claims of the other members of the Class, as all members of the Class have been similarly affected by Defendants' wrongful conduct.

194.    Each Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

195.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts or omissions, as alleged herein;

(b)    whether the Offering Documents contained materially inaccurate and misleading statements and omitted to contain material facts necessary to make the statements made therein not misleading and/or otherwise required to be stated therein; and

(c)    to what extent Plaintiffs and the other members of the Class have sustained damages and the proper measure of such damages.

196.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM
### Violation of §11 of the Securities Act
### Against Uber, the Individual Defendants, and the Underwriter Defendants

197.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

198.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendant Uber, each Individual Defendant, and each Underwriter Defendant.  This is a non-fraud cause of action.  Plaintiffs do not assert that any Defendant committed intentional or reckless misconduct or that any Defendant acted with scienter or fraudulent intent in connection with this claim.

199.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

200.    Uber is the registrant and issuer of the Class A shares of Uber common stock purchased by Plaintiffs and the Class.  As such, Uber is strictly liable for the materially inaccurate, misleading, and

incomplete statements contained in the Registration Statement and for the failure of the Registration Statement to be complete and accurate.  By virtue of the Registration Statement containing materially inaccurate and misleading statements, and having omitted to state material facts necessary to make the statements therein not false and misleading, Uber is liable under §11 of the Securities Act to Plaintiffs and the Class.

201.    Each Individual Defendant signed the Registration Statement.  As such, each is strictly liable for the materially inaccurate and misleading statements contained in the Registration Statement and for the failure of the Registration Statement to be complete and accurate, unless he or she is able to carry their burden of establishing an affirmative "due diligence" defense.  Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the Registration Statement contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, none of the Individual Defendants will be able to establish an affirmative "due diligence" defense, on which they bear the burden of proof, and each such Defendant is liable to Plaintiffs and the Class under §11 of the Securities Act.

202.    Each Underwriter Defendant served as an underwriter in connection with the IPO.  As such, each is strictly liable for the materially inaccurate and misleading statements contained in the Registration Statement and for the failure of the Registration Statement to be complete and accurate, unless it is able to carry its burden of establishing an affirmative "due diligence" defense.  Each Underwriter Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the Registration Statement contained all facts required to be stated therein.  In the exercise of reasonable care, each Underwriter Defendant should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact

necessary to make the statements made therein not misleading.  Accordingly, none of the Underwriter Defendants will be able to establish an affirmative "due diligence" defense, on which they bear the burden of proof, and each such Defendant is liable to Plaintiffs and the Class under §11 of the Securities Act.

203.    None of the Defendants named in this claim made a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Registration Statement were true, materially complete and free of any omission of any material facts required to be disclosed, or were not materially misleading.

204.    None of the untrue, misleading, or incomplete statements of fact in the Registration Statement alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Registration Statement did not properly identify any of the untrue, misleading or incomplete statements as forward-looking statements, nor did it provide information that undermined the putative accuracy and completeness of these statements.

205.    Plaintiffs acquired Uber's Class A common stock pursuant or traceable to the Registration Statement and without knowledge of the untruths, misleading statements, and/or omissions alleged herein. Plaintiffs have sustained damages, and the price of Uber's Class A common stock declined substantially. Although Plaintiffs have no affirmative burden to plead or proof causation, Plaintiffs state that none of the Defendants will be able to establish an affirmative "negative causation" defense, on which they bear the burden of proof, as they will be unable to disprove that Plaintiffs' losses have been suffered, in whole or in part, due to material misstatements in or omission from the Registration Statement.

206.    This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the IPO.

207.    By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violation of §12(a)(2) of the Securities Act**
**Against Uber, the Individual Defendants, and the Underwriter Defendants**

208.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

209.    This claim is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), on behalf of the Class, against Defendant Uber, each Individual Defendant, and each Underwriter Defendant. This is a non-fraud cause of action.  Plaintiffs do not assert that any Defendant committed intentional or reckless misconduct or that any Defendant acted with scienter or fraudulent intent in connection with this claim.

210.    Defendants named in this Claim were sellers, offerors, and/or solicitors of purchasers of the shares of Uber Class A common stock that were offered and sold pursuant to the defective Prospectus. Defendants issued or caused to be issued the Prospectus, which was used to induce investors, such as Plaintiffs and the other members of the Class, to purchase the Company's shares.  Each Defendant solicited the purchase of securities motivated at least, in part, by a desire to serve their own financial interests.

211.    The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  The actions of solicitation by the Defendants named in this Claim included participating in the preparation of the materially inaccurate, misleading, and incomplete Prospectus; participating in the roadshow for the IPO; and participating in the marketing of Uber's Class A common stock to investors, such as Plaintiffs and the other members of the Class.

212.    Defendants named in this claim owed to the purchasers of Uber's Class A common stock, including Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true, that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading, and that the Prospectus contained all facts required to be stated therein. By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material facts and omissions of material facts necessary to make statements therein not misleading.  By virtue of the Prospectus containing materially inaccurate and misleading statements, and having omitted to state material facts necessary to make the statements therein not false and misleading, Uber is liable under §12 of the Securities Act to Plaintiffs and the Class.

213.    Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

214.    None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Prospectus were true, materially complete and free of any omission of any material facts required to be disclosed, or were not materially misleading.  Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.  In the exercise of reasonable care, each Defendant should have known of the material misstatements and omissions contained in the Prospectus and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, and leaving aside defendant Uber (which is not entitled to even assert such a defense), none of the remaining Defendants will be able to establish an affirmative "due diligence" defense, on which they bear the burden of proof, and each such Defendant is liable to Plaintiffs and the Class under §12 of the Securities Act.

215.    This Claim is brought within one year after discovery of the untrue statements and omissions in the Prospectus and within three years after the Company's shares were sold to the Class in connection with the IPO.

216.    By reason of the conduct alleged herein, the Defendants named in this claim violated §12(a)(2) of the Securities Act.  Although Plaintiffs have no affirmative burden to plead or proof causation, Plaintiffs state that none of the Defendants will be able to establish an affirmative "negative causation" defense, on which they bear the burden of proof, as they will be unable to disprove that Plaintiffs' losses have been suffered, in whole or in part, due to material misstatements in or omission from the Prospectus.  Accordingly, Plaintiffs and the other members of the Class who hold the shares issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members who have sold their Uber shares seek damages to the extent permitted by law.

**THIRD CLAIM**
**Violation of §15 of the Securities Act**
**Against the Individual Defendants**

217.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218.    This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Individual Defendants.

219.    The Individual Defendants were controlling persons of Uber within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at Uber, as alleged above, these Defendants, individually and collectively, had the power to influence and exercised same over the Company to cause it to engage in the conduct complained of herein.  As the Registration Statement states:

> Upon the closing of this offering, our executive officers, directors, and current beneficial owners of 5% or more of our common stock will, in the aggregate, beneficially own approximately 44.5% of our outstanding shares of common stock, assuming no exercise of the underwriters' over-allotment option. These persons, acting together, will be able to significantly influence all matters requiring stockholder approval, including the election of directors and the approval of significant corporate transactions, such as mergers, consolidations, or the sale of us or all or substantially all of our assets.

Moreover, the Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Uber.

220.    In addition, the Registration Statement concedes that all of Uber's directors who were then-serving on the Board, did so "pursuant to the provisions of a voting agreement between [Uber] and certain of [its] stockholders."  Upon the closing of the IPO, the aforementioned agreement was to terminate and the parties to the new voting agreement "agreed to vote their shares so as to elect":

> (1) one director designated by Benchmark Capital Partners VII, L.P., currently [Defendant] Cohler; (2) one director designated by TPG Equity Holdings, L.P., currently [Defendant] Trujillo; (3) one director designated by Expa-1, LLC, currently [Defendant] Camp; (4) one director designated by Ryan Graves, currently [Defendant] Graves; (5) one director designated by The Public Investment Fund, currently [Defendant] Al-Rumayyan; (6) three directors designated by Travis Kalanick, currently [Defendant] Kalanick, [Defendant] Burns, and [Defendant] Thain; (7) the person serving as our Chief Executive Officer, currently [Defendant] Khosrowshahi; (8) five independent directors nominated by a committee of our board of directors and approved by a majority of the voting directors, currently [Defendant] Huffington, [Defendant] Martello, and three vacancies; (9) one unaffiliated director nominated by a committee of our board of directors and approved by a majority of the voting directors as our Chairperson, currently [Defendant] Sugar; and (10) subject to approval by the Committee on Foreign Investment in the United States, two directors designated by SoftBank, both of which seats are currently vacant.

221.    Defendants Khosrowshahi, Cohler, Trujillo, Camp, Al-Ramayyan, Graves, Burns, Thain, Sugar, Huffington, Kalanick, and Martello were each critical to effectuating the IPO by signing or authorizing the signing of the Registration Statement, voting to execute the IPO, and by otherwise directing through their authority the processes leading to the execution of the IPO.

222.     Similarly, each of the Individual Defendants not only controlled those subject to liability as primary violators of §§11 and 12(a)(2) of the Securities Act, as alleged in the Causes of Action above, they directly participated in controlling Uber by having signed or authorized the signing of the Registration Statement and authorizing the issuance of Uber stock to Plaintiffs and members of the Class.

223.     As control persons of Uber, each of the Individual Defendants are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as Uber for its violations of §§11 and 12(a)(2) of the Securities Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Class, pray for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiffs as the Class Representatives;

B.     Awarding Plaintiffs and the other members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the other members of the Class rescission or damages (which may include a rescissory measure of damages) to the extent permitted by law on their §12(a)(2) claims;

D.     Awarding Plaintiffs and the other members of the Class pre- and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other litigation costs, expenses, and disbursements;

E.     Awarding Plaintiffs rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court; and

F.     Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  December 5, 2020          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_s/ John T. Jasnoch_____

69

1      JOHN T. JASNOCH (CA 281605)

HAL D. CUNNINGHAM (CA 243048)

2      600 W. Broadway, Suite 3300
San Diego, CA 92101

3      Telephone:  619/233-4565
619/233-0508 (fax)

4      jjasnoch@scott-scott.com
hcunningham@scott-scott.com

5

      – and –

6

7      WILLIAM C. FREDERICKS (*pro hac vice forthcoming*)
JONATHAN M. ZIMMERMAN (*pro hac vice forthcoming*)

8      **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building

9      230 Park Avenue, 17th Floor
New York, NY 10169

10     Telephone:  212/223-6444
212/223-6334 (fax)

11     wfredericks@scott-scott.com
jzimmerman@scott-scott.com

12     *Counsel for Plaintiffs and the Class*

13     **ROBBINS GELLER RUDMAN & DOWD LLP**

14       s/ James I. Jaconette (w/ permission)
JAMES I. JACONETTE (CA 179565)

15     665 West Broadway, Suite 1900
San Diego, CA 92101-8498

16     Telephone:  619/231-1058
619/231-7423 (fax)

17     jamesj@rgrdlaw.com

18     *Counsel for Plaintiffs and the Class*

19     **COTCHETT, PITRE & McCARTHY, LLP**

20       s/ Joseph W. Cotchett (w/ permission)
JOSEPH W. COTCHETT (CA 36324)

21     MARK C. MOLUMPHY (CA 168009)
GINA STASSI (CA 261263)

22     TYSON REDENBARGER (CA 294424)
San Francisco Airport Office Center

23     840 Malcolm Road, Suite 200
Burlingame, CA 94010

24     Telephone:  650/697-6000
650/697-0577 (fax)

25     jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com

26     gstassi@cpmlegal.com
tredenbarger@cpmlegal.com

27

      *Counsel for Plaintiffs and the Class*

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1 FRANCIS A. BOTTINI, JR. (CA 175783)
  ALBERT Y. CHANG (CA 296065)
2 YURY A. KOLESNIKOV (CA 271173)
  **BOTTINI & BOTTINI, INC.**
3 7817 Ivanhoe Avenue, Suite 102
  La Jolla, CA 92037
4 Telephone:  858/914-2001
  858/914-2002 (fax)
5 fbottini@bottinilaw.com
  achang@bottinilaw.com
6 ykolesnikov@bottinilaw.com

7 STEPHEN J. ODDO (CA 174828)
  BRIAN J. ROBBINS (CA 190264)
8 **ROBBINS LLP**
  5040 Shoreham Place
9 San Diego, CA 92122
  Telephone:  619/525-3990
10 619/525-3991 (fax)
  soddo@robbinsllp.com
11 brobbins@robbinsllp.com

12 MARION C. PASSMORE (CA 228474)
  W. SCOTT HOLLEMAN (CA 310266)
13 **BRAGAR EAGEL & SQUIRE, P.C.**
  101 California Street, Suite 2710
14 San Francisco, CA 94111
  Telephone:  415/365-7149
15 passmore@bespc.com
  holleman@bespc.com

16

17 ARI Y. BASSER (CA 272618)
  JORDAN L. LURIE (CA 130013)
18 **POMERANTZ LLP**
  1100 Glendon Avenue, 15th Floor
19 Los Angeles, CA 90024
  Telephone:  310/432-8492
20 abasser@pomlaw.com
  jllurie@pomlaw.com

21 JEREMY A. LIEBERMAN
  J. ALEXANDER HOOD II
22 **POMERANTZ LLP**
  600 Third Avenue, 20th Floor
23 New York, NY 10016
  Telephone:  212/661-1100
24 212/661-8665 (fax)
  jalieberman@pomlaw.com
25 ahood@pomlaw.com

26 BRIAN J. SCHALL (CA 290685)
  **THE SCHALL LAW FIRM**
27 1880 Century Park E, Suite 404
  Los Angeles, CA 90067-1604
28 Telephone:  310/301-3335

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1
2

310/388-0192 (fax)
brian@schallfirm.com

DAVID W. HALL (CA 274921)
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94104
Telephone:  415/766-3534
415/402-0058 (fax)
dhall@hedinhall.com

CURTIS V. TRINKO
**LAW OFFICES OF CURTIS V. TRINKO, LLP**
39 Sintsink Drive West, 1st Floor
Port Washington, NY 11050
Telephone:  516/883-1437
ctrinko@trinko.com

*Additional Counsel for Plaintiffs and the Class*

3
4
5
6
7
8
9
10
11
12

## **ATTESTATION**

13
14
15

        Pursuant to L.R. 5-1(i), I attest that concurrence in the filing of this document has been obtained from the other signatories.

16
17

                                        s/ John T. Jasnoch
                                        JOHN T. JASNOCH

18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933